# CHARLESTON.

SMITH *et al.* v. CORNELIUS *et al.*

Submitted September 7, 1895—Decided November 13, 1895.

1. BERKELEY SPRINGS—TRUSTEES OF BERKELEY SPRINGS.
    The property known as the "Berkeley Springs" is the property of the state of West Virginia, the legal title being in the corporation known as the "Trustees of the Berkeley Springs," in trust for the public, as provided by chapter 202, Acts 1882.

2. BERKELEY SPRINGS—PRESUMPTION OF DEDICATION.
    Possession and undisputed claim of ownership by Virginia and this state of said property for one hundred and ninteen years raises a presumption of a grant or dedication by Lord Fairfax, as lord of the fee, for public use.

3. PRESUMPTION OF GRANT—UNINTERRUPTED POSSESSION.
    Long and uninterrupted possession of land with claim of ownership will justify a presumption of a grant.

4. PRESUMPTION OF DEDICATION—UNINTERRUPTED POSSESSION—PUBLIC USE.
    Long and uninterrupted possession of land by the state, with claim of ownership for public use, and user by the public, will

raise a presumption of a dedication by the proper owner for such public use.

5. PUBLIC CORPORATIONS—*Ultra Vires* ACT—PRIVATE PERSON.

Where a public corporation vested with state property for public use makes a lease of it which is *ultra vires*, a private person can not sustain a suit to contest it; this can be done only by the state or the corporation.

6. PUBLIC CORPORATIONS—DIRECTORS.

Directors, as such, of such corporation, can not sustain such a suit.

7. PUBLIC CORPORATIONS—DIRECTORS.

Nature of office of directors discussed.

8. PUBLIC CORPORATIONS—DIRECTORS.

Liability of directors for wrongful acts referred to.

9. BERKELEY SPRINGS—LEASE—*Ultra Vires* ACT.

The lease involved in this case of its property by the trustees of the Berkeley Springs is *ultra vires* and void.

10. PUBLIC CORPORATIONS—TRANSFER OF POWERS—LEGISLATIVE CONSENT.

A public corporation vested with powers by the state to be exercised for the public can not transfer to another the exercise of such powers, and make a lease of its property necessary to enable it to execute its functions, without legislative consent.

11. PUBLIC CORPORATIONS—NOTICE OF RESTRICTIONS.

Persons dealing with a corporation must take notice of what is contained in the law of its organization, and must be presumed to be informed of the restrictions annexed to the grant of power by the law by which the corporation is authorized to act.

12. PUBLIC CORPORATIONS—ACTION TO ANNUL.

A conveyance is made to one and his assigns. In a suit to annul it, until it appear that he has transferred the property, such assigns need not be made parties, as unknown assigns or otherwise.

13. PUBLIC CORPORATIONS—ACTION TO ANNUL—PARTIES.

In a suit to annul an act of a corporation as *ultra vires*, the corporation must be a party.

W. H. TRAVERS AND FLICK & WESTENHAVER for appellant:

I.—*It was error to allow the amended bill to be filed.*—24 W. Va. 72; 3 W. Va. 138; 1 Paige, Ch'y, 424; 2 Paige, 67; 11 Ves. 565; 11 Ga. 539; Bart. Ch. Prac. 324, 327; High. Inj. § 990; 11. W. Va. 464; 1 Bart. Ch. Prac. 467; 5 W. Va. 579; High. Inj. § 1017.

II.—*The court below should not have perpetuated the injunction*

*on the hearing of the motion to dissolve it.*—74 Am. Dec. 123; 2 Dan'l, Ch. Prac. 1682; 1 Bart. Ch. 468; High, Inj. § 95; 4 Min. Inst. 902; Code, c. 125; 8 W. Va. 210.

III.—*It was error to dissolve the injunction because the corporation the "Trustees of Berkeley Springs" was not made a party and to perpetuate the injunction in the absence of the "unknown assigns" of Daniel Cornelius.*—Acts 1882, c. 102; 18 Wall. 626; 1 Mor. Corp. § 267; 3 Paige, 222; 41 Am. Dec. 364; 104 Mass. 365; 2 Dan'l, Ch. Prac. 1678; 1 Bart. Ch. Prac. 225, 226, 466; 5 W. Va. 579; High. Inj. 1017; 12 Sim. 416; Tur. & Russ. 297; 33 W. Va. 155; 10 W. Va. 29; 21 W. Va. 124.

IV.—*The plaintiffs have no right to maintain this suit.*—9 Hen. St. 247; Kerchival's Hist. Valley, 210, 213, 243; Acts 1857-58, c. 161; Acts 1868, p. 171; Acts 1872, c. 145; Acts 1882, c. 202; Acts 1862-3, c. 68; 19 W. Va. 604; 22 W. Va. 282; 6 Pet. 431; 2 Pet. 566; 12 Wh. 582; 10 Pet. 662; 61 Am. Dec. 221; 27 Am. Dec. 554; 40 N. J. L. 608; 1 Mor. Corp. § 260; Code, c. 37, s. 4; Id. c. 109, ss. 6, 7, 9, 10; 3 Leigh, 451, 462, 467, 476; 4 Wheat. 1; 2 Sim. Am. St. 67; 14 Allen, 539; 13 Allen, 101; 12 Peters, 91; 29 W. Va. 326; High, Inj. §§ 747, 753, 755; 2 Mor. Corp. §§ 1041-1043; 18 N. Y. 155; 3 Rand. 68; 13 W. Va. 484; 1 Mor. Corp. §§ 235-259, 505, 531, 532, 562; 13 Am. St. 578; 104 Mass. 385; 25 W. Va. 108, 111; 26 W. Va. 486; 22 Pick. 24, 31; 12 Met. 371; 141 U. S. 133, 146, 147, 151, 157; 10 Am. Rep. 684; 17 Am. & Eng. Enc. 112; 38 N. J. Eq. 373; 33 Am. St. 57; 95 U. S. 313; 11 Allen, 446.

V.—*The contract of January 23, 1895, was one proper to be made.*--1 Mor. Corp. § 532, 626; 17 Am. & Eng. Enc. Law, 5, 85, 86; Dev. Deeds, §§ 247, 348; 32 W. Va. 244; 11 Leigh, 294; 18 W. Va. 376; 29 W. Va. 1, 21; 35 Fed. Rep. 161; 1 Am. & Eng. Enc. Law, 466, note; 1 N. Y. 290-294; Mor. Corp. §§ 534, 535, 536; Perry Trusts § 511, 687; 27 Am. & Eng. Enc. Law, 140, 141; Hill on Tr. 463; 3 Mer. 539; 10 Ves. 555, 560; 17 Ves. 283, 291.

D. B. LUCAS for appellee:

" *While the propriety of allowing amendments to injunction bills*

*has been said to be exceedingly questionable, it may be regarded as an established rule that the bill may be amended, even after motion to dissolve the injunction, and if when so amended it shows sufficient cause for continuing the injunction, which is not overborne by defendant, it will be continued.*"
—( 2 High. on Injunc. 1592.)

"*If the directors of a corporation are guilty of a breach of trust, injurious to the corporate property, or to the rights of the shareholders, or a portion of them, and if the corporation refuses to institute the proper proceedings to restrain, or redress such injury, one or more of the shareholders may do it in their individual names.*"—Thompsons Liability of Officers of Corporations, 385, also 353; Morawetz on Priv. Corps. §§ 389, 392, and § 246, n.; 26 W. Va. 486; 28 W. Va. 623; 37 W. Va. 73; 30 W. Va. 443, syl. 1.

"*The protection of the rights of shareholders in incorporated companies against the improper or illegal action of other shareholders, or of the officers of the company, is a favorite branch of the jurisdiction of equity by injunction. And it may be asserted as a general rule, that courts of equity may enjoin, in behalf of the stockholders of an incorporated company, any improper alienation or disposition of the corporate property for other than corporate purposes, and will restrain the commission of acts which are contrary to law and tend to the destruction of the franchise, as well as the improper management of the business of the company, or a wrongful diversion of its funds or from depriving plaintiff of his rights as a corporator.*

"*And in such case equity may grant relief at the suit of a single stockholder. So if the managers of the company are about to engage in any enterprise not contemplated by their charter, or are proceeding to apply corporate funds to any other than corporate purposes, or, in general if they are transcending their charter, equity will interfere.*"—( 2 High. on Injunc. § 1203.)

*On the point that the trustees could not delegate their trust*, see Morow. on Pr. Corps. § 249.

*That notice to all the directors was necessary before an authorized meeting could be held.*—(See Id. § 247.

Brannon, Judge:

J. Rufus Smith, President of the Board of Trustees of

Berkeley Springs, and C. P. Jack, A. R. Unger, and H. C. Harmison, trustees of said board, filed a bill of injunction in the Circuit Court of Morgan county against Daniel Cornelius and his assigns, unknown to the plaintiffs, alleging that the said board of trustees constituted a corporation with the usual incidents; that they had been incorporated by act of the legislature of West Virginia passed March 27, 1882, it being chapter 202 of the Acts of 1882; that the plaintiffs had applied to all the trustees to unite with them in the bill, but only those who were plaintiffs consented to do so; that before any general meeting of the board, irreparable injury might be done to the springs, baths, and other public property committed to the care and charge of said trustees; that certain of the trustees had assembled and undertaken to organize themselves into a special meeting, and by a vote of four out of six trustees then present, made an agreement with Daniel Cornelius, or his assigns, to alien the said public property for the term of ninty nine years, and, for the improvement thereof and the public use and manageing and controlling it, Cornelius and his assigns were by the agreement allowed to tear down and remove the present bath houses, beautify the grounds, erect new bath houses and an hotel, and manage and control the public property, charging certain rates for certain baths and certain other rates, to be fixed by Cornelius, for other baths, receiving the returns from the property, and paying the trustees one per cent. of net profits from the baths. The bill alleged that for certain reasons given, the meeting of the trustees at which the agreement was made was irregular and unauthorized to make it, and that it was an act in violation of the charter of said board, as found in said act of 1882, and against its prohibition, and that the action of the board, and the lease deed which had been executed under it (thus leasing the public property and its control, and granting Cornelius and his assigns special and peculiar privileges) were violative of the said act, and of the trust reposed in said trustees, and beyond the power of the trustees, and void. The bill prayed an injunction to restrain Cornelius and his assigns from proceeding under the lease, or taking possession of the property, and that the lease be declared void.

An amended and supplemental bill was filed, alleging that since the preparation of the original bill, a meeting had been called of the trustees to take into consideration the subject of enjoining Cornelius from going on with the lease, but the meeting refused to take any action looking to an injunction. This amended bill made the corporation, the Board of Trustees of the Berkeley Springs, a party defendant. Such proceedings were had that a motion to dissolve the injunction awarded upon the bill was overruled, and the injunction was perpetuated, and Cornelius brought this appeal.

A question which at once calls for decision in this case is, have the plaintiffs a right to maintain this bill? This renders it pertinent, if not indispensable, to ascertain the ownership of the grounds at the town sometimes called "Bath," sometimes "Berkeley Springs"—the county seat of Morgan county, known as the "Public Grounds," containing those springs whose waters have been famous for their medicinal properties for one hundred and fifty years—since that ownership will indicate who is to prevent the illegal alienation of the property and its diversion from its proper use.

At this date the Court can have no difficulty in asserting that those grounds are the property of the state of West Virginia. Were we back in time near the Act of October, 1776, we likely could not assert the public right to this beautiful property with so much confidence. By that Act the Virginia legislature (9 Hen. St. p. 247) it would seem, simply seized fifty acres of the land of Thomas, Lord Fairfax, the celebrated proprietor of the Northern Neck of Virginia, by vesting it in trustees to be laid off into quarter-acre lots, with convenient streets, and established them as a town by the name of "Bath," and authorized the trustees to sell those lots for building purposes, to "accommodate numbers of infirm persons who frequent those springs yearly for the recovery of their health." The act reciting no consent on the part of Lord Fairfax, nor providing for obtaining his consent, and from its mercifully reserving to him "one large and convenient spring, suitable for a bath," and exempting from sale any lot whereon he may have

built a house, would seem to be an act of confiscation. Though it gave him, in mercy, the proceeds of sale, yet it took the fee—the land—from him forever. The act enacted that all the "Warm Springs," as they were then called, except the one reserved to Lord Fairfax, should be vested in the trustees, "in trust to and for the public use and benefit, and for no other purpose whatsoever." Under this clause the trustees marked out that square or plot of ground containing the celebrated springs, and reserved it for public use for the healing and pleasure of the people, as we find it in our day. It is a park of beauty, as well as a fountain of health and pleasure, used and enjoyed by thousands of people every returning summer. The public title can not be shaken at this late day. Perhaps it was once questionable. Was that old act of 1776 one of forfeiture or confiscation, or did the Lord Fairfax consent to it? We do not know. If he consented, it does not appear. Those were troublous times when that act passed. The stately and noble old Lord Fairfax, though the patron and unflinching friend of Washington, so much so that he is said to have declared that, if the American Revolution failed, he would save Washington's neck, was yet to the core loyal to King George, as well we might expect him to be when he bethought himself of the princely landed estate vested in him by descent from ancestors who had received it from royal grant. So loyal was he to the mother country, as Kercheval says, that when he heard at Greenway Court of the surrender of Cornwallis at Yorktown, and foresaw the loss of the English cause, he called a servant to put him to bed, saying, "It is time for me to die." He died December 10, 1781.

Perhaps it was because of his known disloyalty to the colonies that this act of 1776 was passed. Was it valid? We need not inquire. The old lord, bent with age, made no resistance to it. Neither did the Reverend Denny Martin, his nephew and devisee, nor those who subsequently claimed under him. The commonwealth of Virginia claimed it to be, as it was in fact long held in actual possession for public use, its property.

In March, 1857, we find an act of its legislature recog-

nizing it as public property, as it declared that "the public property in the town of Bath, in the county of Morgan, known as the 'Public Square and Berkeley Springs,'" shall be vested in and governed by a board of trustees, whom it named, and whom it constituted a corporation by the name of the "Trustees of the Berkeley Springs," and made sundry provisions of regulation. Thus, the state of Virginia owned it. It passed to West Virginia by the legislative grant of Virginia to the new state, found in chapter 68 of the Acts of 1862-63 of the legislature of the reorganized government of Virginia. West Virginia has always claimed it. We find a resolution of the legislature of 1868 (page 171) calling on the trustees for a plan to secure to the state the revenue from the property, which, it is said, is the property of the state; and chapter 145, Acts 1872, declares: "The public grounds in the town of Bath, in the county of Morgan, known as the 'Public Square,' and the medicinal springs and improvements thereon, shall be and continue under the management and control of a board of trustees, in trust as heretofore, for the public use and benefit." It terminates at a fixed time the powers of the then trustees, and names others, and declares them and their successors a corporation by the name of the "Trustees of the Berkeley Springs" and makes divers provisions for the management.

By chapter 231, Acts 1872-73, the legislature assumes control over the property, authorizing a lease or mortgage. By chapter 202, Acts 1882, the legislature again declares that the property, in the language of the act of 1857, shall be held by trustees for public use, and appoints trustees, and declares them a corporation.

Thus, we find, by the two states, unbroken possession for one hundred and nineteen years, with claim of title and ownership, and no one disputing it. Of course, under the statutes of limitation, the state acquired indefeasible title. And so, from this great lapse of time, we would conclusively presume either a grant or a dedication from Lord Fairfax—either or both, as might be requisite to sustain the state's title. *Campbell* v. *Wheeling*, 12 W. Va. 36; *Archer* v. *Saddler*, 2 Hen. & M. 370; 1 Lomax, Dig. p. 782 tit. "Pre-

scription;" *Matthews* v. *Burton*, 17 Grat. 312; *Cincinnati* v. *White*, 6 Pet. 431, 438. See note on dedication in *State* v. *Trask*, 27 Am. Dec. 559, covering the whole subject; *Cole* v. *Sprowl*, 56 Am. Dec. 696; *Harris' Case*, 20 Grat. 833.

Question might arise whether the act of 1882 vested title or only control in the body corporate; but as the act of 1857 used the word "vest," and clothed the corporation with title, and the corporation has had continuous being since, though its members have changed, and the act of 1882 continues it "under the management and control of the trustees in trust as heretofore, for public use," I think the dry title is in the corporation; the state being the beneficial owner, with power to resume all title at its will.

Thus, the state being owner, who but it shall, who but it can, through its law officer, the attorney-general, or by some action of the legislature, assail the action of the trustees in making the lease to Cornelius? Here is a corporation —not a private joint-stock one, but a public one—managing public property for public ends, with no private interests in it. I here borrow language from Green's Brice's *Ultra Vires* (page 698) as pointedly expressive of the law on this point, and abundantly supported by authorities from all quarters : "No person may institute proceedings with respect to wrongful acts which, if of a private nature, are not wrongs to himself, and, if of a public nature, do not specially affect himself." Same author says, on page 700, that the attorney-general is the party to move, and, until he does so, no other one can. No refusal by the attorney-general to move in the matter is here shown, and, if it were, these trustees could not do so for want of interest. This rule is applicable though the act be one *ultra vires*, says same author (page 703). See *Talbott* v. *King*, 32 W. Va. 6 (9 S. E. Rep. 48); High, Inj § 747; 1 Beach, Pub. Corp. §§ 13, 351, 352; *Springer* v. *Walters*, 139 Ill. 419 (28 N. E. Rep. 761); *State* v. *Cunningham*, 81 Wis. 440 (51 N. W. Rep. 724;) Grant. Corp. 138 ; 2 Dill. Mun. Corp. p. 1100, § 909, note 1; *Id.* § 910; *Seager* v. *Kankakee Co.*, 102 Ill. 669. See, specially, *Attorney-General* v. *Railroad Cos.*, 35 Wis , on page 526. A suit to enjoin the sale and injury of a public park by a city can not be brought by an individual, but only by the attorney-general or properly authorized officer. *Mowry*

v. *City of Providence*, 16 R. I. 422, (16 Atl. 511.) It surely can not be that anybody and everybody can intermeddle in the affairs of the state. If so, where would be the end or limit of litigation and confusion? In some cases, where the attorney-general has refused to act, courts have acted at the relation of a citizen, though not interested. *State* v. *Cunningham*, 83 Wis. 90 (53 N. W. Rep. 35) and *Id.* 81 Wis. 440 (51 N. W. Rep. 724). It appears that the corporation can contest an *ultra vires* act of its directory. But, though a private citizen may not do so, it is abundantly settled that where there is a corporate excess of power, which tends to the public injury or defeats public policy, it may be restrained in equity at the suit of the attorney general. *Stockton* v. *Railroad Co.*, 50 N. J. Eq. 52 (24 Atl. 964); Green's Brice, *Ultra Vires*, p. 706; Pom. Eq. Jur. § 1093; 2 Dill. Mun. Corp. 910; Beach. Inj. § 1344; *Attorney-General* v. *Railroad Companies*, syl. 4, 35 Wis. 425, particularly 526, 527; 2 Mor. Priv. Corp. § 1043.

But the plaintiffs, to sustain their right to sue, say they are not simply private individuals, but president and members of the board of trustees. This does not give them capacity to sue. Directors are only agents of the corporation to conduct its business, and not the corporation, and, as such, have not a shadow of interest in its property, and need not be stockholders, unless statute or by-law so requires, and can not act individually, as they have no inherent power as agents, but only collectively as a board. *Pennsylvania Lightning Rod Co.* v. *Board of Education*, 20 W. Va. 360. They are but officers "representing the interests of that abstract legal entity, the corporation, and those who own shares of its stock." *Addison* v. *Lewis*, 75 Va. 702; *Burr* v. *McDonald*, 3 Grat 215; 4 Thomp. Corp. § 4875; 3 Thomp. Corp. §§ 3904, 3905; 1 Mor. Priv. Corp. § 531. "They can act in behalf of the corporation only as a board. Their power is not joint and several, but joint." *Buttrick* v. *Railroad Co.*, 13 Am. St. Rep. 578. They are not even proper defendants in suits against the corporation. 1 Mor. Priv. Corp. § 258. How, then, can we say that the act of the plaintiffs in bringing this suit, without any authority from the board, is even an official act? The corpo-

ration could sue to enjoin this lease, but this is not a suit of the corporation. Here, I think the case of *Stewart* v. *Thornton*, 75 Va. 215. very apposite, holding that, as a county school board is a corporation, suit to recover a fund belonging to it must be brought in the corporate name, and that a suit by persons styling themselves "directors of the county school board" could not be maintained. Judge Burks said the suit was not by the corporation, but by Thornton and others, who were members of the board, and acted under the erroneous impression that because they were such members, they could maintain the suit in their names. He referred to a similar erroneous impression in the case of *People* v. *Fulton*, 11 N. Y. 94, where certain persons brought suit in their own names, as trustees of a religious society, instead of its corporate name, to recover possession of property belonging to it. The court said: "Incorporated religious societies are aggregate corporations, and whatever property they acquire is vested in interest in the body corporate; and, while the officers have it under their control, whatever possession they have is the possession of the artificial person whose agents they are. Though called 'trustees,' they do not hold the property in trust for the corporation or religious society. The name is simply the title of their office, and their position respecting the corporate property would be the same if they were denominated 'directors' or 'managers.' Their right to intermeddle is an authority, not an estate, or title. They have no other possession than the directors of a bank have of a banking house. This would be so upon general principles relating to the legal nature of corporations, apart from the particular language of the act relating to religious corporations." Other cases are cited by Judge Burks.

The plaintiffs are not stockholders. The state is the only owner of the corporate property, though the technical legal title may be in the corporation. Stockholders of joint-stock companies may sue because of their interest as such, to vindicate corporate rights under certain circumstances stated in *Crumlishs' Adm'r* v. *Railroad Co.*, 28 W. Va. 623; *Park* v. *Oil Co.*, 26 W. Va. 486; *Moore* v. *Schoppert*, 22 W. Va. 282; *Rathbone* v. *Gas Co.*, 31 W.

Va. 798 (8 S. E. Rep. 570.) But those cases are not material in this case, as the plaintiffs do not and can not sue as stockholders. These trustees are but directors. No matter about their denomination. Their status is that of directors. No authority is cited to sustain such a suit by directors but Thompson on Liability of Officers of Corporations (453) a work not in our library. An adverse brief states that it is based only on the English case of *Discount Co.* v. *Brown*, L. R. 8 Eq. 381. I have examined this case, and it surely decides no such proposition. A judge said the director sought to be charged with liability for acts *ultra vires* should have called the stockholders together, and laid the matter before them, and requested them to sue, or have sued himself. This is a mere incidental opinion or *dictum arguendo*, not authority. It is said this authority in directors to sue must exist, else they would be liable for wrongs of the directors, without means to protect themselves. But surely, directors not parties to a wrongful act are not liable for acts of others. Without intending to state the rule accurately or fully, in the absence of close investigation, which I do not deem necessary in this case, I apprehend that directors are not liable for wrongful acts of other directors, unless they connive at them, or the loss is the result of their own neglect of duty, when ordinary care would have averted the loss; and they are not liable for their own acts unless fraudulent or a misappropriation of funds; and they are not liable for error of judgment or want of knowledge. *Briggs* v. *Spaulding*, 141 U. S. 132 (11 Sup. Ct. 924); Spering's Appeal, 10 Am. Rep. 684; 3 Thomp. Corp. §§ 4019. 4109

Another question very important in the case is whether the action of the board in making the lease to Cornelius transcended its powers, rendering that lease unlawful. For myself, I have had no question since the oral argument, and now, since I have carefully examined, I have no question but that this lease is an act beyond the powers of the board, and void; and this whether we view the subject as under the common law of corporations or under the act which constitutes the charter of the corporation known as the "Trustees of the Berkeley Springs." View the matter

first under the common law of corporations. A corporation is an artificial being, created by the state, for the attainment of certain defined purposes, and therefore vested with certain specific powers, and others fairly and reasonably to be inferred or implied from the express powers and the object of the creation. Acts falling without that boundary are unwarranted—*ultra vires*. If the act sought to be done is foreign to the nature and design of the corporation, it is *ultra vires;* and, though the act be calculated to attain the purpose, yet it may be *ultra vires* because of the undue means of accomplishing it. "Corporations created by statute must depend, both for their powers and the mode of exercising them, upon the true construction of the act creating them." "The statute, *quoad* the corporation, is an enabling act, not only in regard to the powers conferred, but also as to the mode prescribed for exercising those powers; and, unless the mode so prescribed is observed by the corporate body, its act will not bind the corporation." *Pennsylvania Lightning Rod Co.* v. *Board of Education*, 20 W. Va. 360. Here we find a public corporation, vested with valuable land, property of the state, to answer an object deemed of public utility by the state, and charged, by the plainest construction, with the duty of retaining in itself absolute possession of it, and commanded in words to manage and control it for public use and benefit, and receive the revenues arising therefrom; vested with these powers not beyond recall, but subject to recall or modification at the will of the legislature; the body composed of particular persons named by the legislature, because, as we must presume, of particular confidence in their personal management of the property and their fitness. We find the board of this corporation making a lease of the property to one individual, not able financially to perform his agreement, for a term of ninety nine years—a term longer than the life of nearly every human being then living—giving him exclusive possession, with power to utterly change the grounds, tear down the bath houses, receive all revenues, fix his own charges on certain baths; in short, to hold, occupy, manage, and control, according to his will, the property, in place of the thirteen chosen agents of the state. If we say that

any franchise existed in the corporation, and can say that it retained it notwithstanding this lease, yet it was a mere lifeless, hollow shell, as, by the lease, the board deprived itself for a century of the property and means of carrying out the charge committed to the corporation, and transferred the right to do just what it was charged with doing, which is the substance and soul of the franchise. If this lease be valid, what becomes of the right of the state to sell the property or change its policy or mode of managing it for the public use? Even a private corporation, unless authorized by charter to do so, can not lease or dispose of its franchise or its property needful in the performance of its obligations to the state, without legislative consent; and I should think that, for a stronger reason, a public corporation can not. *Stockton* v. *Railroad Co.*, 50 N. J. Eq. 52 (24 Atl. 964); *Pennsylvania R. Co.* v. *St. Louis, A. & T. H. R. Co.*, 118 U. S. 290 (6 Sup. Ct. 1094); *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Central Transp. Co.* v. *Pullman Palace Car Co.*, 139 U. S. 24, (11 Sup. Ct. 478). It can not sell out its business and assets. 3 Thomp. Corp. § 3983; 2 Mor. Priv. Corp. §§ 512, 513; 1 Beach, Priv. Corp. §§ 361-363. The supervisors of Norfolk county and the council of the city of Norfolk leased a ferry for thirteen years, but it was held void. It was held that the right of disposal was not incident to the ownership of property held as a public trust. *Roper* v. *McWhorter*, 77 Va. 214. We can not infer any such power as inherent in this corporation. As well might the directors of the hospitals for the insane or of the penitentiary assume to turn over to others the institutions and powers committed to them, so far as the power to do so is concerned. To allow such a total alienation of functions and property indispensable to execute them would be to enable a body of public agents chosen for fitness to avoid the doing of their duty, and delegate their powers—create a deputy. In this instance, one man, not chosen by the state, becomes the deputy of thirteen, charged with all their capacities in matters requiring discretion and judgment, and to their exclusion. A public corporation can not thus delegate powers committed to it. Could any other state institution do so? 1 Beach, Priv.

Corp. § 536 ; 1 Mor. Priv. Corp. § 536.   Apart from the question of the lease of the property, they can not delegate the exercise of their judgment, discretion, and official functions.   But this contract effectually does so, by giving Cornelius sole management, yielding only one *per cent.* of net profits as a rental.

Another reason against the validity of this lease is that it is flatly in the teeth of a prohibition in the act giving life to this corporation, and direction to its trustees.   That act, after creating the corporation, and vesting it with its property and powers, inserts a proviso—I say a proviso— "that the said trustees shall have no power to mortgage or otherwise alien the public property aforesaid, nor shall they grant to the proprietor of any hotel, or any other person, any special or exclusive privileges in the use or enjoyment of said springs or public grounds."   The word "alien" is used.   My search in Abbott's, Anderson's, Bouvier's, and Black's Law Dictionaries does not tell me that the word means anything in law but to transfer property, thus covering a lease as well as a conveyance in fee.   The transfer of an estate for years as much falls under the broad word "alien" as a transfer of the fee.  The lease conveys the very title, not in fee, but the whole title, for its term.   It is absolute for that term, not a mere deed of trust with power to end it by redemption.   A particular estate is carved out of the fee, and title to it conveyed.   Surely, a conveyance of the absolute possession for ninety nine years is an alienation.   It is certainly so within the sense of this proviso ; for it can not be thought that the legislature intended to forbid only the transfer of the fee, and yet allow an absolute lease, carrying the possession and use for so long a period as ninety nine years.   The word "otherwise" here has force.   The language is "mortgage or otherwise alien," meaning in any wise alien.   The act of 1857 contained this same prohibition.   The act of 1873 gave authority to lease, notwithstanding any prior law ; but the act of 1882 returned to the policy of the act of 1857, by reinserting the same prohibition as that found in the act of 1857, repealing all acts in conflict, thus affording a reason to say that by the late act it was meant to repeal the act of 1873.   And this lease, be-

sides giving Cornelius sole control, confers on him special and exclusive hotel privileges, contrary to the meaning of the act of 1882.

Thus, I am clear in the opinion that the trustees had no color of authority to make this lease. Whether it was advisable or not we have no right to say. No power could authorize it but the legislature. Of this want of power in the trustees, Cornelius and all others must take notice, for no one can plead ignorance of law; and "persons dealing with corporations must take notice of what is contained in the law of their organization, and they must be presumed to be informed as to the restrictions annexed to the grant of power, by the law by which the corporation is authorized to act." *Silliman* v. *Railroad Co.*, 27 Grat. 119; *Haden* v. *Association*, 80 Va. 633; *Relfe* v. *Rundle*, 103 U. S. 222.

Objection is made that the case was not matured as to the unknown assigns of Cornelius. The bill makes the unknown assigns parties, but does not aver any alienation by Cornelius. His answer does not aver any, or give any names of alienees, but, to the reverse, states a mere hope to effect one. I do not think that if a bill states and exhibits a deed from A. to B. and his assigns, no assigns appearing, it renders it necessary to make them parties. The title is yet in Cornelius, for aught that appears. Multitudes of old deeds convey to a person and his assigns. In a bill to set such a deed aside, must assigns be made parties, it not appearing there are any? I should think not.

It is assigned for error that the court allowed an amended bill to be filed, first, because the original was yet at rules, and there had been no proceeding but a motion to dissolve made in term, at which time the amended bill was tendered, and the amended bill was allowed at a subsequent term, while the original was still at rules. We should construe the statute for amendment liberally. If there was reason for the amendment, I think it could be tendered in term, and allowed in term, though the case on the original be at rules. Was there need of the amendment? Surely, there was, as the corporation was not a party, and it was a necessary party. Like a natural person, if its rights are involved, it ought to be before the court; and, if the parties do not

bring it in, the court ought to require it; and the party but did by this amendment what the court would require. Code, c. 125, s. 58. It was an indispensable party. Where the question is one of the validity of its acts, whether it is *ultra vires*, affecting the corporation itself, it is especially necessary that it be a party. Green's Brice, *Ultra Vires*, p. 653; *Hurst* v. *Coe*, 30 W. Va. 158 3 (S. E. 564).

Secondly, it is objected that all the matter of this second bill was known to the plaintiffs before it was filed, and therefore leave to file it ought not to have been given. I do not understand our liberal practice as debarring an amended bill simply because the party, when he filed the original, knew a fact which, by inadvertence, he omitted or did not deem it pertinent. That would be a harsh rule, exacting perfect recollection and judgment at the first step. It is within the discretion of the court. If unreasonable delay in asking to file it exists, and there is no excuse, doubtless leave might be refused.

But here there was no unreasonable delay in tendering it. This bill charged that the board had sanctioned the lease, by subsequent action, and it made the corporation for the first time a party. It was proper to charge this ratification, and absolutely indispensable to bring the corporation before the court, and this alone justified the amended bill.

It is objected that the defendant entered a motion to dissolve, and that instead of passing on it alone, leaving the injunction stand, the court went on to perpetuate it, while the original bill was at rules, and the case not on the hearing docket. The case was in the court, though at rules. Cornelius filed his answer to the original bill on May 14th, and on May 17th the motion to dissolve and to file amended bill were argued; and on June 25th leave to file amended bill was allowed, and the defendants appeared, waived further service of process, and adopted, as their joint and several answers to both bills, the answer already filed by Cornelius; and the case was heard on the bills, said answer, replications, depositions, and exhibits, and argument of counsel. No continuance asked. No objection to hearing, though that hearing, as just shown, was on the merits. No

denial of the matter of the amended bill was made. No one wanted to take further steps in the case. Under these facts, as the bill was purely an injunction, we can not say it was error to perpetuate the injunction, instead of merely overruling the motion to dissolve. I do not see how any prejudice resulted to Cornelius, as all the facts were in. He made no show of presenting any, or altering the phase of the case.

There was a demurrer to the bill. It ought to have been sustained, and the bill dismissed, for want of capacity and interest in the plaintiffs to maintain it; and, as the only plaintiffs had no interest, the bill was not amendable by the substitution or introduction of the state or corpora-tion as plaintiffs. There was no community of interest between them to be brought in. Opinion in *Stewart* v. *Thornton*, 75 Va. 221.

We sustain the demurrer and dismiss the bill. It is need-less to say that this is without prejudice to a suit by the state or the corporation.