# CHARLESTON

## LOGAN v. WARD.

Submitted June 16, 1905.    Decided November 21, 1905.

1.  EJECTMENT—*Adverse Claimant—Cloud on Title.*

    An owner of land in actual possession who is entered upon by an adverse claimant may, both by common law and chapter 90 of the Code, maintain ejectment against the intruder, and cannot sustain a bill in equity to remove cloud over his title.   (p. 369.)

2.  QUIETING TITLE—*Cloud on Title—Removal of Cloud.*

    Equity will entertain a suit to remove cloud over the title to land by one in actual possession against an adverse claimant not in actual possession who sets up an adverse title.   (p. 370.)

3.  QUIETING TITLE—*Title to Maintain—Actual Possession.*

　　A bill to remove cloud over the title to land cannot be maintained, unless the plaintiff has both title and actual possession. He cannot rely on weakness of the title of his adversary. (p. 370.)

4.  QUIETING TITLE—*Cloud on Title—Evidence.*

　　When a patent or deed includes within the exterior bounds of the lands thereby conveyed lands which are excepted by such grant or deed from its operation, a plaintiff in equity suing to remove cloud from his title must show that the land he claims against the defendant is not the land so excepted. (p. 375.)

5.  JOINT TENANCY—*Adverse Possession—Presumption of Grant.*

　　The law will not presume a grant of his undivided share from one joint tenant to another simply from mere silent possession by one for a long time. (p. 375 )

6.  ADVERSE POSSESSION—*Presumption of Grant.*

　　A presumption of a grant from lapse of time with possession never arises where all the circumstances are consistent with the non-existence of such grant. (p. 375.)

Appeal from Circuit Court, Randolph County.

Bill by James H. Logan against Wirt C. Ward and Elihu Hutton. Decree for defendants, and the heirs of said plaintiff appeal.

*Affirmed.*

C. H. SCOTT and MOLLOHAN, McCLINTIC & MATHEWS, for appellants.

BAKER & STRADER, HARDING & HARDING, M. H. DENT, and LINN, BYRNE & CATO, for appellees.

BRANNON, PRESIDENT:

James H. Logan brought a chancery suit against Wirt C. Ward and Elihu Hutton to remove a cloud over Logan's title to land, and upon the hearing Logan's suit was dismissed, and his heirs appealed.

I state Logan's claim thus: By patent dated 13th February, 1798, the State of Virginia granted to William Bowyer, William Breckenridge, Hugh Paul and Edward Bryan a tract of 50,000 acres of land in Randolph county, called the Breckenridge survey. William Logan obtained the conveyance of the Breckenridge and Paul shares in said tract, and was thus owner of half of it. James H. Logan claims that his father, William Logan, had deeds for the other interests in the tract, but does not show them. William Logan by deed dated 15th May, 1851, conveyed to his sons, James

H. and Joseph M. Logan, that portion of said tract, west of Elk Water run to a certain line running N. 70 W., and Joseph M. and James H. Logan afterwards by deed 1st August, 1899, made a divison between them of said portion of the Breckenridge survey whereby that part of it covering the land in dispute became the sole property of James H. Logan. Thus James H. Logan claims under the Breckenridge survey. It is the only title set up by his bill. The bill states that the Breckenridge tract was sold by the United States in 1815 for direct taxes, and was purchased by Jinks, and conveyed by him to See, who conveyed part of it, said to include the land in controversy in this case, to William Logan by deed dated 20th November, 1851. This seems to be the same part of said survey before conveyed by William Logan to James H. and Joseph M. Logan. The grant from Virginia to Bowyer and others for the fifty thousand acres is what is called an inclusive grant, that is, lands are included within its bounds which were excepted from the operation of the patent. This patent excluded thirteen thousand six hundred and ninety acres for prior claims. The deed from Jinks to See also excluded the same lands covered by prior claims which were excepted in the said patent, as also several thousand acres which Jinks had disposed of before he conveyed to William Logan. The deed of Jinks may be thus called an inclusive deed. The deed from William Logan to James H. and Joseph M. Logan is a quit claim deed. James H. Logan and Joseph M. Logan also obtained a grant from Virginia dated 30th November, 1850, for eight hundred and fifteen acres of land claimed to be within the bounds of the Breckenridge grant. James H. Logan and his father long before him had actual possession within the bounds of what he claims to be the Breckenridge survey, and he continued that possession at the date of the commencement of this suit. Neither side had actual possession of the land in controversy in this case, but Logan claims constructive-actual possession by reason of his possession inside of the Breckenridge survey. Logan asserts that the land claimed by the defendants is inside his part of the Breckenridge grant. The claim of the defendants is under a grant from the State of Virginia to J. M. Bennett and John S. Hoffman for nine hundred and ninety acres, dated

1st February, 1854, which came by conveyance to defendant Wirt C. Ward, with whom Elihu Hutton had an interest. The defendants also set up a claim under a grant of one hundred and five thousand acres, known as the Welsh survey, which Hutton claims. The bill avers that under these grants to Bennett and Hoffman and Welsh the defendants Ward and Hutton set up a claim adverse to Logan, but averred no actual possession in them.

Counsel for Logan devotes effort to sustain the equity jurisdiction in this case, seeming to doubt it because of the well known rule that equity will not try title to land. It is true that this is practically an ejectment in equity, because it is only a battle between distinct and adversary titles; but the case falls under the head of equity jurisdiction to dispel cloud over title to land arising from adverse claim. There is some evidence in the case tending to show that the defendants were in possession of the disputed land, and if that were in fact so, I do not think a suit in equity could be sustained, since by common law I think it is clear that where one man is in actual possession and another enters upon him under adverse claim, the true owner, may, by common law, regardless of our ejectment statute, sustain ejectment. The intruder's entry is a disseisin or ouster, but only a partial one, to the extent of his inclosure, his adversary still retaining his former possession. *Taylor* v. *Burnside*, 1 Grat. 223; *Core* v. *Faupel*, 24 W. Va. 246. The true owner still remaining in possession may treat his enemy's entry as an ouster and sue in ejectment. "The plaintiff in possession of a portion of the premises may bring ejectment for the remainder in the defendant's possession." 1 Am. & Eng. Ency. L. (2 ed.) 526. *Tapscott* v. *Cobb*, 11 Grat. 172; *Witten* v. *St Clair*, 27 W. Va. p. 771; *Stewart* v. *Coalter*, 4 Rand. 74. Therefore, if in fact defendants were in possession when suit was begun, I think there could be no jurisdiction in equity because before our present ejectment statute ejectment would lie. Equity long ago assumed jurisdiction to remove cloud, but only in favor of one in possession, because he could not sue in ejectment; but where both are in possession he can sue by common law. *Va. Co.* v. *Kelly*, 24 S. E. 1020. But the evidence shows that the defendants were not in possession actual when this suit began, and

counsel for defendants do not base any stand on that theory. The bill states only hostile claim, not possession. The evidence shows that William Logan and his sons under him had possession many, many years before this suit, seventy-five or eighty years, and James H. Logan continued in possession actual. Some evidence goes to show that some years before the suit was brought a cabin, or rather a shanty, was built on the land in a trackless wilderness, and during one summer one Salisbury one night in the week slept in it, his actual residence with his family being elsewhere. There was no inclosure or cultivation. It was mere nominal transient possession of nights. It was no open, notorious, continuous occupation. It was not possession actual in the eye of the law. Hutchison, Land Titles § 365; *Anderson* v. *Harvey*, 10 Grat. 386. Therefore, there is jurisdiction in equity for this suit, and we pass to a consideration of its merits.

This is an ejectment in equity, because a contest between hostile titles, and in it we must apply the rule in ejectment that a plaintiff must recover upon the strength of his own title, no matter how weak his opponent's title may be. Those only who have a clear title connected with actual possession have a right to claim the interference of equity to dispel a cloud over their title. *Henry* v. *Oil Co.*, 57 W. Va. 255; *Hitchcock* v. *Morrison*, 47 *Id.* 206; *Christian* v. *Vance*, 41 *Id.* 754; *Moore* v. *McNutt*, 41 *Id.* 695; Hogg, Eq. Princip. 83; *Helden* v. *Helden*, 45 Am. St. R. 371, 80 Md. 616; *Dewing* v. *Wood*, 111 Fed R. 575 and citations in Judge Goff's opinion. The plaintiff cannot recover, unless he fixes on the ground his exterior boundaries by lines and corners. *Coal Co.* v. *Howell*, 36 W. Va. 490; *Miller* v. *Holt*, 47 *Id.* 7. The plaintiff cannot meet this requirement. He claims under the Breckenridge survey. He has not identified it. He claims that the defendant's land lies within that survey. The defendants deny it. Not a corner or a line of that survey is proven. No man proves that he ever saw a corner or line of it. No reputation thereof is given. Marstiller's evidence is relied on by the plaintiff. He is a young man of only forty-two. He does not state that he ever saw what he knew to be an original corner or line to this old survey made away back in 1798. He tested no corners or lines. It is proven that clearing and fire breaks have destroyed them, if

ever they existed.   Marstiller says he never made a survey of the lines of the Breckenridge survey, but simply believes that a plat, made by the attorney for the purpose of this case, truly represents that survey.   Or rather he says that if the plat made by counsel to show Logan's claim is correct, it would cover the controverted land; but he does not say it is correct.   It is only fair to Marstiller to say that he repudiates speaking from actual knowledge.   He says as a sample of his evidence "No sir, of my own knowledge, I don't know this."

Taking his whole evidence it is manifest that he knows nothing of the actual location of the survey, and simply has an opinion as to its location standing on no basis.   The same may be said of Tallman's evidence.   He is fifty-six years of age.   He says he knows of the survey only in a general way. When asked if he knew the Breckenridge survey he replies, "I know of it in a general way."   He never ran or tested any of its known lines.   Though asked if he had seen any of the original corners or marked lines, he could not say that he had.   He said he did not give much attention to marks when he was running a line or two at the request of the plaintiff's attorney in this case.   He said he was not definite about the lines.   Next take the evidence of James H. Logan, himself a surveyor.   I can safely say that if any living man could be brought to identify this survey it would be Logan. He says he was born in 1816, and with his father moved from Rockbridge county, Virginia, to this survey in 1827. His father claimed it and resided, as claimed, within the survey.   James H. Logan and his brother claimed it for years.   He knew it when a young, active man, when the marked trees constituting its lines and corners, were yet probably standing.   He was a practical surveyor, deputy of the county surveyor.   In all his surveying, in all the surveying of those old surveys, he does not tell us on the witness stand that he saw or knew a marked corner or line tree of this old survey, or had one shown him by an ancient. He said distinctly, "I have never made a survey of these lines of the Breckenridge survey, but believe it is correct as laid down in the map."   He refers to the map or plat used in the present case.   He does not claim to know a corner or line except from mere hearsay—not that even.   His evidence

is wholly insufficient to identify and establish this survey.
The great point of controversy in this case is the location of
the western line of the Breckenridge survey, as James H.
Logan claims a part of it lying between Elk Water run and
the western line of the survey. Is the land in controversy
inside the western line, as claimed by Logan, or outside of
it, as claimed by the defendants? The evidence does not
answer this question, unless it answers it for defendants.
The burden is on the plaintiff to show that the land he claims
is inside the line. Logan says himself, as a witness, "I do not
know exactly where the western boundary line of the Breck-
enridge survey is located, I never run it." His own action
and declarations in the past strongly war against his claim in
this case. He was a surveyor, and in 1846 as deputy sur-
veyor of Randolph county he made a survey for an entry of
four hundred and thirty acres for himself and his brother,
and in it he makes its lines call for a Breckenridge line.
That would make the Breckenridge line have a location far
from the line he claims now to be its western line in this
suit, and would locate it as the defendants claim it, and
throw the land contested in this case outside the Brecken-
ridge survey. Now, this is strong evidence against Logan.
When he was a young man of thirty years, living right in
the Breckenridge survey, as he claims, while yet its corner
and line trees were likely standing, and ascertainable, he
fixed that line in a different place from where he now claims
it. He would be then likely to know the corners and the
lines; but if he did know them, he does not tell us so now as
a witness. If he cannot locate them, who can? But he says
he cannot do so. He does not do so. Away back many
years he told several persons, who are witnesses in this case,
that the western line of the Breckenridge survey was along
the four hundred and thirty acres, or where the defendants
would locate it, not where Logan now claims it to be. He
admitted that the Bennett-Hoffman did not conflict with his
land. I would not cast aspersion on the memory of Mr.
Logan, and I think this is to be explained by the fact, mani-
fested by his whole deposition, that he did not know the
location of this line. We are referred to this particular
portion of his evidence. He was asked "Do you know where
the beginning corner of the Breckenridge survey is?" and

answered, "Yes, I know. It is the south corner of the old Jacob Ward place." He said so simply because the patent called for "a corner to lands of Jacob Ward." It was mere opinion, a "take-for-granted," because he did not say that he ever saw the corner, or saw a man who saw it, or had been told by anyone who knew it. He says he did not of his own knowledge know a corner. Shall we fix the corner from the Jacob Ward land? That is not located. If one tract is to be located by another, that other must itself be located. We must take his entire deposition to get its meaning. Stress is laid upon evidence of Tallman. He surveyed what is said to be the western line of the Breckenridge tract. That is the line on which the controversy in this case hangs. If here, the plaintiff's claim covers the land in controversy; if not here, it does not. He ran the line as Logan pointed it out. Logan did not know it—never saw a tree of it. He said frankly, "I do not know exactly where the western boundary line of the Breckenridge survey is located. I never run it." Well, Tallman ran this line for miles, and not an old line tree did he find. He says so. On another line he saw two marked trees, but could not say that they were corners. He had no ax, did not block any. He said of these trees, "Don't know whether they were original corners or not." Not one tree does he prove to be a corner or line tree. Not a witness says he ever looked upon a corner or line tree of this old survey. Logan was on the ground from 1827 near the beginning corner, but never saw it or any other corner or line tree. He does not, nor does any witness, say that any old man pointed out or said that any tree belonged to the survey. Not even the slightest reputation of any tree's belonging to the survey is shown. *Harriman* v. *Brown*, 8 Leigh 697, allows proof of declarations to prove identity of a corner by a person deceased having peculiar means of knowledge, as a surveyor, or chain carrier on the original survey, or the owner of the tract or adjoining tract of same boundary, or tenants and others whose duty or interest would lead to diligent and accurate information, always excluding declarations liable to suspicion of bias from interest. No evidence of this kind even was offered. There is a total want of evidence to identify the Breckenridge survey, or to show that its western line covers the disputed

land.  Logan proves no title to it.  I think that not only
does the evidence of plaintiff fail to prove that the Brecken-
ridge survey covers the land in dispute, but proves that it
does not do so.

As to any claim under the See deed, that is liable to the
same objection just stated; it is not located; for the See land
is the Breckenridge land.  Besides, the deed from See to
Logan being a quit claim deed dating after the conveyance
from William Logan to James H. Logan and Joseph M.
Logan, they could derive no title from it.  Such a deed does
not pass after-acquired land.  Such titles as William Logan
had to it went to his heirs and they are not joined in this
suit, as they must be to recover, they being parceners.
Newell on Eject. 64; 7 Ency. Pl. & Prac. 317; *Marshall* v.
*Palmer*, 91 Va. 344; *Nye* v. *Lovitt*, 24 S. E. 345.  This is
another bar against Logan's recovery in this suit.  The bill
alleges that the Breckenridge tract was sold for direct taxes,
purchased by Jinks, and by him conveyed to See, and by
him conveyed in part to William Logan.  The bill does not
assail this tax title, but on the contrary puts it forward as a
good title.  It is vested in William Logan's heirs, of whom
we know there were several.  Is it not an outstanding title?

I see another reason against Logan's success in this
suit.  Logan presents deeds to his father for only two
of the four shares of the patentees under the Brecken-
ridge patent; but for want of deeds from the other two
patentees under the Breckenridge patent he summons the doc-
trine that from long possession the law will presume convey-
ances from them to his father or to him.  There is a salutary
principle that from long possession the law sometimes pre-
sumes a grant in order to quiet possession and make it con-
sistent with rightful title.  The tooth of time may have
destroyed the deeds.  Under this rule this Court raised a
presumption that Lord Fairfax had granted to Virginia the
famous Berkeley Springs property now owned by this State.
Virginia and this State had held long, long possession, but
showed no grant.  One was presumed.  *Smith* v. *Cornelius*,
41 W. Va. 59.  It is established that grants from the state
will be so presumed.  *Mathews* v. *Burton*, 17 Grat. 312; 1
Greenl. Ev., § 45.  A deed from a vendor to vendee may be
presumed to save land from forfeiture.  *Hale* v. *Marshall*,

14 Grat. 489. Valuable discussion of this interesting subject will be found in *University* v. *Reynolds*, 23 Am. Dec. R. 234; 1 Jones Ev. §§ 72, 73, 74. But this presumption is raised to protect a title apparently good, but wanting a formal grant. It is only where, but for such grant, possession would be wrongful. 1 Greenl. Ev. § 46. But this presumption cannot be raised to prove an ouster by one joint tenant, parcener or tenant in common of another, or to prove a grant from one to another. In this State the law is confirmed by numerous cases that the possession of one such person is the possession of the others, and there can be no adverse ˙claim˙ or title, unless there is actual ouster, and notice or knowledge of hostile claim brought home to the other party. Mere silent possession by one, no matter how long continued, does not destroy the right of another, unless there be ouster, adverse claim, with notice to the other of adverse claim. *Justice* v. *Lawson*, 46 W. Va. 163; *Cochran* v. *Cochran*, 55 *Id.* 178; *Cooley* v. *Porter*, 22 *Id.* 121; *Boggess* v. *Meredith*, 16 *Id.* 1. "Where the possession of one is entirely consistent with title in another, it cannot give rise to a presumption of a conveyance from the latter." 22 Am. & Eng. Ency. L., (2 ed.) 1290. *Ricard* v. *Williams*, 7 Wheaton 59, says that this presumption can never arise "where all the circumstances are perfectly consistent with the non-existence of a grant." As the possession of one joint tenant is consistent with that of another—is in fact his possession—the law raises no presumption that the other has conveyed his title to the one in possession. No presumption is raised that two of the patentees conveyed their shares to William Logan, or that James H. Logan's heirs conveyed their right under the See deed to James H. Logan. Their rights are outstanding.

There is another insuperable obstacle in the way of the plaintiff's success. The Breckenridge grant and the Jinks deed being an inclusive grant and deed, that is, excluding from their operation certain lands and passing no title to the excepted land, Logan must show that the land he seeks to assert title to in this case is not the land so excepted. The reason for this will be found stated in *Stockton* v. *Morris*, 39 W. Va. 432. I cannot add anything to what is there said, except to add to the authorities there cited the case of

*Reusens* v. *Lawson*, 91 Va. 227. That case again overrules the case of *Hopkins* v. *Ward*, 6 Munf. 38, and holds, that where the title papers of the plaintiff disclose the fact that the exterior boundaries of the survey upon which a grant or deed to one under whom he claims is founded, includes lands which have been excepted from the operation of the grant, or lands which have been aliened since the grant was issued or the deed made, and which have been excepted from the operation of the deed of his grantor, it is incumbent on the plaintiff to show that the lands in controversy are not within the excepted lands. Also later case of *Va. Coal Co.* v. *Keystone Co.*, 45 S. E. 291. Does not *Kenna* v. *Quarrier*, 3 W. Va. 210, hold the same? There is not a particle of evidence in this case to meet the requirement of the law; none to show that the land involved in this suit is not the land excepted in the Breckenridge patent and See deed from Jinks.

There is another bar against Logan's recovery. The land he claims from the defendants is forfeited for omission to charge it for taxes. The Breckenridge was on the books down to 1851. In 1852 William Logan was charged with six thousand acres transferred to him from C. C. See. He abandoned all the land save that part conveyed by See by omitting from tax books. The six thousand acres continued on until 1856. In 1857 Logan is charged with four thousand seven hundred and fifty acres in lieu of six thousand, and was charged with four thousand seven hundred and fifty acres down to 1860, and it was never afterwards on the books. That is the last charge to William Logan. Never was any of this land under the Breckenridge title charged to James H. and Joseph M. Logan, because the quit claim deed to them from their father, dated 15th May, 1851, never was on record until August 5th, 1899. Anyhow, it was not on the books to them. So we say that the Breckenridge was not, in the whole or part, on the books after 1860. That forfeits it for non-entry under Article 13, section 6, Constitution. It is true that Logan and his brother, Joseph, owned three tracts of eight hundred and fifteen, one thousand and one thousand acres, and they, in one or another name, have been on the tax books, one from 1851, one from 1852, one from 1854; but their title to the eight hundred and fifteen acres came from a grant, 30th November, 1850, to James H. and Joseph M.

Logan, under a deed from J. M. Crouch, 26th April, 1852, for one thousand acres, and a deed from Adam See for one thousand acres, 31st December, 1851. These titles were not under their father's title, but hostile and different. These were distinct tracts, of prescribed boundary, not covering the land in dispute, not claimed to do so, clearly proven not to do so. Their taxation could not save the balance of the Breckenridge land from forfeiture. There is no identity between the title under that grant and those deeds and that under William Logan; no identity between the lands so charged and that in dispute. Though inside the Breckenridge bounds, the taxation of tracts of specific bounds would not save from forfeiture lands outside the bounds of those three tracts; the taxation of two thousand eight hundred and fifteen acres of specific limits would not save the whole fifty thousand acres. I repeat that the three tracts so taxed do not include the disputed land. Any right to that under the Logan claim is outstanding in the state, not in Logan.

We see no reason to differ with the finding of the circuit court, and therefore affirm its decree.

*Affirmed.*

Poffenbarger, Judge, (*dissenting*):

The decree in this cause, which the Court now affirms, does not merely dismiss the bill because plaintiffs fail to show their title to the land, covered by the patent which they wish to cancel, and thus remove a cloud from their title, but determines that the plaintiffs have no title and that the defendants have. The decree reads as follows: "It is therefore adjudged, ordered and decreed that the plaintiffs take nothing by their said bill and suit, that the same be wholly dismissed and that the said defendants," etc.

Believing as I do that, under our practice, the ordinary equity jurisdiction, unaided by statute, there can be no such thing as an ejectment in equity, I cannot concur in that part of the decision which affirms the adjudication against the plaintiffs as upon the merits. I think the bill should have been dismissed in such manner as not to prejudice any rights which they might assert in any other proper proceeding either at law or in equity. The theory of a bill to remove a cloud is clearly and well stated by the supreme court of

Mississippi, in *Phelps* v. *Harris*, 51 Miss. 789, as follows: "This jurisdiction of equity cannot properly be invoked to adjudicate upon the conflicting title of parties to real estate. That would be to draw into a court of equity from the courts of law, the trial of ejectments. He who comes into a court of equity to get rid of a legal title, which is allowed to cast a shadow on his own title, must show clearly the validity of his own title, and the *invalidity of his opponent's*." This was quoted with approval by the Supreme Court of the United States in the same case on appeal. 101 U. S. 370, 375. In *Orton* v. *Smith*, 18 How. 263, Mr. Justice Grier said: "Those only who have a clear legal and equitable title to land connected with possession, have any right *to claim the interference of a court of equity* to give them peace and dissipate a cloud upon the title." This Court asserts the same principle and rule in *Harr* v. *Shaffer*, 45 W. Va. 709, in the following language: "A party who files a bill to remove a cloud from his title to a tract of land, who shows on the face of his bill that he has no title to the land himself, and no right to interfere with others who appear to have good title thereto, is not entitled to be heard in a court of equity, and his bill will be dismissed." See Hogg's Equity Principles, § 46. The principle is strikingly illustrated in *McRee* v. *Gardner*, 131 Mo. 599, in which the court held as follows: "Where a bill to remove a cloud on the title to land is dismissed because plaintiff is not in possession, the judgment should not be so absolute as to constitute a bar to the maintenance by plaintiff of another form of action he may have to the land." Originally, equity jurisdiction to quiet title did not arise until after one or more trials in ejectment. *Stark* v. *Starrs*, 6 Wall. 402. Mr. Justice Field said: "The equity asserted in such cases had its origin in the prolonged litigation which the action of ejectment permitted. That action being founded upon a fictitious demise between fictitious parties, a recovery therein constituted no bar to a second similar action, or to any number of similar actions for the same premises. With slight changes in these fictions a new action might be instituted and conducted as though no previous action had ever been commenced. Thus the party in possession, though successful in every case, might be harrassed if not ruined by the continued litigation. To prevent such litigation, after one

or more trials, and to secure peace to the party in possession, courts of equity interposed upon proper application and terminated the controversy." This jurisdiction to quiet title differs from the jurisdiction to remove a cloud, but it falls short of an ejectment. It proceeds upon the assumption of a perfect title in the plaintiff. ascertained and determined in a court of law, and does not open the door of the equity court to a re-trial of the matters which have been determined in the law court. It has jurisdiction to restrain one of the parties from vexatiously re-litigating questions of title which have already been settled in the legal forum. In order to invoke such jurisdiction, the plaintiff must show his possession and his perfect title. Thus he may call in a paper under which his adversary claims and cause it to be cancelled, to the end that it may no longer be the means of annoyance to him. So, a bill to remove a cloud invokes a jurisdiction which goes only against the paper title of the adversary, to cancel it because of its invalidity in some respect, so that no vexatious litigation may be predicated upon it. The plaintiff cannot call for the exercise of that jurisdiction until he shows title in himself and possession of the property. If he fails to do this, he is not in a position to invoke the juristion of the court and his bill should merely be dismissed, not because the defendant has superior title, but because the court cannot adjudicate anything as between them except that the plaintiff is not in a position to demand cancellation of the defendant's title papers. Equity cannot try questions of title, unless jurisdiction be obtained upon some equity in the party. *Freer* v. *Davis*, 52 W. Va. 1. In this class of cases, the plaintiff shows no equity, and can show none, until he has established his title and possession. When he fails to do this, he fails to bring himself and his adversary within the jurisdiction of the Court and want of jurisdiction is all the Court can declare or adjudicate.