14143

ALDERMAN *ET AL.* v. ALDERMAN *ET AL.*

(181 S. E., 897)

10

*Messrs. Epps & Epps* and *Robinson & Robinson,* for appellants,

*Messrs. A. C. Hinds, T. H. Stukes* and *L. D. Lide,* for respondents,

October 5, 1935.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

Some time prior to the death of D. W. Alderman, Sr., who owned practically all of the stock of D. W. Alderman & Sons Company and Alcolu Railroad Company, South Carolina corporations, which stock comprised substantially his entire property, he divided his holdings or stock equally amongst his six children, R. J. Alderman, Paul R. Alderman, Mrs. Mary Lula Shaw, Miss Martha Alderman, Mrs. Mozelle A. Rice, and D. W. Alderman, Jr. There is some question as to when D. W. Alderman, Jr., came into posses-

sion of his stock, but it is immaterial for the purpose of deciding the issues involved in this case.

Following the death in September, 1921, of D. W. Alderman, Sr., it was found that he owned a few scattered tracts of land in his individual name and some bank and warehouse stock, and all of his six children, who were his sole heirs and distributees at law, joined in a deed conveying such real estate to D. W. Alderman & Sons Company and joined in and transferred the bank and warehouse stock to the same corporation.

For a number of years prior to the death of their father, R. J. Alderman and Paul R. Alderman had the active management, under his general supervision, of both Alcolu Railroad Company and D. W. Alderman & Sons Company, the latter named corporation being one of the largest lumber manufacturing plants in South Carolina and having extensive timber holdings.

It is a universally known fact to lumbermen that the operation of a sawmill and lumber plant, small or large, is a business in which one can lose heavily unless well managed. Indeed, this is so well recognized that it has become an adage among lumbermen, "Never to wish an enemy in torment but wish such enemy owned a sawmill."

Realizing, no doubt, that the success of the corporations, especially D. W. Alderman & Sons Company, depended upon the management, D. W. Alderman, Sr., requested that upon his death R. J. and Paul R. Alderman should be continued in the active management and control of the corporations in order that his well-known policies would be continued, and therefore, in deference to the wishes of the said D. W. Alderman, Sr., and having little if any experience with the operation and management of the business of said corporations, Mrs. Rice, Mrs. Shaw, Miss Martha Alderman, and D. W. Alderman, Jr., severally executed trust deeds or contracts conveying their stock in trust in the said corporations to the said R. J. and Paul R. Alderman. All of

said instruments conveying their stock were of like tenor and purport, the following being a copy of the trust deed or contract signed by Miss Martha Alderman, and the acceptance of the trust signed by R. J. and Paul R. Alderman:

"State of South Carolina,
"County of Clarendon.

"Whereas, on the 25th day of March, 1918, there was issued to me and in my name, by the Alcolu Railroad Company, a corporation duly created and existing by and under the laws of the State of South Carolina, Stock Certificate No. 29 for thirty-three and one-third (33 1/3) shares of the capital stock of said corporation of the par value of Five Hundred ($500.00) Dollars per share, as will more fully appear by reference to said certificate; and

"Whereas, on said date there was also issued to me and in my name, by D. W. Alderman & Sons Company, a corporation duly created and existing by and under the laws of the State of South Carolina, the following certificates of its capital stock to wit, No. 60 for two (2) shares, No. 61 for two (2) shares, No. 62 for three (3) shares, No. 63 for three (3) shares, No. 64 for eight (8) shares, No. 65 for eight (8) shares, No. 66 for eight (8) shares, No. 67 for eight (8) shares, and No. 68 for eight (8) shares, aggregating in all fifty (50) shares of the capital stock of the said D. W. Alderman & Sons Company of the par value of Five Hundred ($500.00) Dollars per share, as will more fully appear by reference to said certificates; and

"Whereas, I reside in the City of Sumter in the State of South Carolina, and do not expect again to permanently reside at Alcolu, South Carolina, where the principal place of business of said companies is located and for that reason it will not be convenient for me to attend the meetings of the stockholders of said corporation which would probably result in inconvenience, hindrance and embarrassment to the management of said companies in failing to have repre-

sented in their stockholders' meeting a majority of the stock; and

"Whereas, by reason of my unfamiliarity with the conduct, operation and management of the business and affairs· of said corporations, it would be necessary for me, if I resided at Alcolu, to have some competent person to represent me at meetings of said stockholders; and

"Whereas, my brothers, Robert J. Alderman and Paul R. Alderman, for the past ten or twelve years, have had the active management and control of the business of said corporations and are thoroughly capable and competent to successfully manage and control the same; and

"Whereas, the value of my said stock depends upon the continued successful management of said corporations; and

"Whereas, the said Robert J. Alderman and Paul R. Alderman, on account of their experience and ability, are better qualified than anyone else to continue the successful management of said corporations; and

"Whereas, the said Robert J. Alderman and Paul R. Alderman have agreed as long as it may be deemed advisable, by the vote of a majority of the whole stock of said corporations, respectively, to continue the operation of their respective business, if said Trustees, or the survivor, so long live; and

"Whereas, the said Robert J. Alderman and Paul R. Alderman by reason of their ability, experience and familiarity with the said business can more capably represent me and better promote and protect my interest in said business than any other person; and

"Whereas, the said Robert J. Alderman and Paul R. Alderman are also stockholders and largely interested in said corporations, and, therefore, the advancement of my interest therein would operate to their advantage, and *vice versa;* and

"Whereas, the appointment by me of some person unacquainted with the affairs of said corporations may result

in giving rise to disputes and differences which would work to the detriment of the interest of all concerned.

"Now, therefore, know all men by these presents, That I, Martha P. Alderman, for and in consideration of the foregoing premises and also in consideration of the sum of Five and No/100 ($5.00) Dollars to me in hand paid by the said Robert J. Alderman and Paul R. Alderman, at and before the sealing of these presents, the receipt of which is hereby acknowledged, have conveyed, transferred, assigned and delivered and by these presents do convey, transfer, assign and deliver unto the said Robert J. Alderman and Paul R. Alderman:

"All and singular the Stock Certificates hereinabove mentioned, described and referred to, issued to me, and in my name, by the said Alcolu Railroad Company and D. W. Alderman & Sons Company.

"To have and to hold the said Stock Certificates unto the said Robert J. Alderman and Paul R. Alderman, or the survivor of them; in trust, nevertheless, for the uses and purposes, upon the terms and with the powers following and none other, that is to say:

"1. To hold, keep and retain the actual and exclusive possession and custody of said certificates or the certificates which may be issued in lieu thereof in the name of 'Robert J. Alderman and Paul R. Alderman, Trustees for Martha P. Alderman' during their lives or the life of the survivor unless the said corporations, or either of them are, or is, sooner liquidated and dissolved: in which event, to surrender to said corporations, or either of them, for cancellation such of said certificates as may be subject to surrender and cancellation by liquidation and dissolution.

"2. At such time as they may see fit and if they deem it advisable, to have all of said certificates duly transferred on the books of said corporations to 'Robert J. Alderman and Paul R. Alderman, Trustees for Martha P. Alderman.'

"3. During the time said Certificates are in their possession and custody as aforesaid, or such possession and cus-

tody of the survivor, to vote said stock (a) in all elections for directors of said corporations, (b) upon all questions and matters relating to the conduct of the business of said corporations upon which the vote of stockholders may be required or deemed proper, (c) upon all resolutions which may be submitted with reference to the sale of the real or personal property of said corporations, or either of them, in whole or in part, and the use, disposition or distribution of the proceeds of such sale or sales, (d) upon all resolutions in connection with the liquidation of said corporations or either of them, and (e) in and upon any and all other matters, things, questions, motions or resolutions which may occur, arise, or be made or submitted and which may require the vote of the stockholders or upon which the vote of the stockholders may be deemed proper, expedient or advisable; and said vote shall be cast, at any meeting of the stockholders of either of said corporations, as in the judgment of said Trustees, or the survivor, may be for my best interest.

"4. To collect and pay to me or my heirs, executors, administrators or assigns, all dividends upon said shares of stock herein mentioned which may hereafter, during the continuance of this trust be declared and paid by the said corporations.

"5. In the event of liquidation of said corporations, or either of them, to promptly collect or procure and pay over and deliver, or have assigned and set apart to me or my heirs, executors, administrators, or assigns, such money or property as shall, at the time of such liquidation and after extinguishing all the liabilities of the liquidating corporation (except that to its stockholders), be payable upon or represented by the said shares of said stock in either of said corporations which may be liquidated.

"6. To have full and exclusive power and authority to do and perform any and all the acts and things hereinabove mentioned and all and every act and thing whatsoever req-

uisite to be done in and about said business, as fully, to all intents and purposes, as I might or could do if personally present.

"7. In case of the death of either of said Trustees during the continuance of this trust, the other or survivor shall have, and the same is hereby granted to him, all the rights, privileges, powers and authority hereby granted to or conferred upon the said trustees jointly, and the said survivor shall be subject to the same duties and responsibilities hereby imposed upon the said trustees jointly.

"In witness whereof I have hereunto set my hand and seal on this 20th day of September, A. D. 1921.

"[Signed] MARTHA P. ALDERMAN.

(L. S.)

"Signed, sealed and delivered in the presence of:

"[Signed] A. C. HINDS,
 M. D. BAKER."

"STATE OF SOUTH CAROLINA,
 "COUNTY OF CLARENDON.

"Know all men by these presents, That we, Robert J. Alderman and Paul R. Alderman, do hereby acknowledge the receipt of the Certificates of Stock issued to, and in the name of Martha P. Alderman, by the Alcolu Railroad Company and D. W. Alderman & Sons Company, mentioned, described and referred to in the within and foregoing Trust Deed, and do hereby declare that we have received the said Stock Certificates, and will hold the same, in trust for the said Martha P. Alderman, her heirs, executors, administrators or assigns, for the uses and purposes and upon the terms and conditions mentioned, set forth and contained in the within and foregoing Trust Deed, and not otherwise; and we hereby assume the duties and responsibilities thereby imposed upon us.

"In witness whereof we have hereunto set our hands and seals on this 20th day of September, A. D., 1921.

"[Signed] ROBERT J. ALDERMAN (L. S.)
"PAUL R. ALDERMAN (L. S.)

"Signed, sealed and delivered in the presence of:

"[Signed] A. C. HINDS,
M. D. BAKER."

Under the authority of these instruments, R. J. and Paul R. Alderman owning together one-third of the stock of these corporations by gift from their father and later on a portion of the stock of the corporations by purchase, continued in the sole control and management of both corporations, and until the death of R. J. Alderman which occurred during the pendency of this action, since which time Paul R. Alderman has been in the control and management of the corporations as survivor under the trust deeds or contracts.

Following the execution of the instruments hereinbefore set forth, all shares of stock owned by the said Mrs. Rice, Mrs. Shaw, Miss Martha Alderman, and D. W. Alderman, Jr., were delivered to R. J. and Paul R. Alderman, who had same canceled on the books of the corporations, and in lieu thereof certificates of stock for like amounts were issued to the said R. J. and Paul R. Alderman as trustees for the various parties owning the beneficial interests therein, and said new certificates of stock were held in the possession of said trustees.

Mrs. Mary Lula Shaw died in July, 1923, but prior to her death she conveyed to her children, the appellants herein, other than Martha P. Alderman, share and share alike, all of the rights and interest which she owned and accruing to her in each and both of said corporations. D. W. Alderman, Jr., became financially involved and one-half of his stock in said corporations was sold subject to the trust deed or contract which he had made, and the same was purchased and is owned by the heirs of R. J. Alderman, Paul R. Alder-

man, Mrs. Mozelle Rice, a Mr. Merritt, Paul Shaw, and Whit Shaw, but not in equal amounts. R. J. Alderman died during the pendency of this action, and the stock he owned is held in the name of Ben Geer Alderman as trustee, one of the duties under the conveyance to him of the stock in trust being to vote said stock so as to co-operate with Paul R. Alderman in the management of the business and affairs of said corporations. Ben Geer Alderman, as executor of the will of R. J. Alderman, was substituted as defendant for said R. J. Alderman.

The complaining parties to this suit represent a fraction more than one-third of the stock of the corporations, and the defendants a fraction less than two-thirds.

The purpose of the action on the part of plaintiffs (appellants in this Court) is to have the instruments which conveyed their stock to R. J. and Paul R. Alderman in trust declared null and void, and if it should be held by the Court that said instruments are not null and void *per se,* then that the Court declare that said instruments have been made voidable by the action of the trustees, and should there be an adverse decision as to this, then to have the Court declare said instruments revocable and revoked; to have R. J. and Paul R. Alderman account for their actions as trustees and to refund the alleged excessive salaries voted to and received by them during the period of their management, and to make good any losses to the corporations occasioned by their unauthorized actions, transactions, and donations.

The position of appellants is that the instruments placing R. J. and Paul R. Alderman in the control of the corporations constituted what is known to the law as "voting trusts"; that they are void and voidable; being without consideration, illegal, and against public policy.

Therefore, the natural approach to a decision is to first inquire what constitutes a voting trust. There are various definitions of a voting trust given by the textbooks and text-writers, among such definitions being as follows:

"A voting trust agreement is an agreement which cumulates in the hands of a person or persons the shares of several owners of stock in trust for the purpose of voting them in order to control the corporate business and affairs." 14 C. J., 915.

"A voting trust may be comprehensively defined as one created by an agreement between a group of the stockholders of a corporation and the trustee, or by a group of identical agreements between individual stockholders and a common trustee, whereby it is provided that for a term of years, or for a period contingent upon a certain event, or until the agreement is terminated, control over the stock owned by such stockholders, either for certain purposes or for all, shall be lodged in the trustee, with or without a reservation to the owner or persons designated by them of the power to direct how such control shall be used." Fletcher's Cyclopedia of Corporations, No. 1705, Vol. 3.

The definitions given by the various leading text-writers are practically in accord, and the whole theory of voting trusts is built upon the idea that a group or a portion of the stockholders of a corporation unite and execute an instrument to a trustee for the purpose of voting and controlling the policies of the corporation, but in no definition, nor reported case, do we find the entire stock of the corporation pooled in the same trustee or trustees. The instruments executed in the case at bar, while containing practically every element going to make up what is commonly known as a voting trust, in fact go farther, and constitute in addition thereto a managing trust and trust deed, and the voting power given under the instruments has been treated as only one of the many powers conveyed by the instruments and as incidental to governing the management of the corporations. The instruments before the Court convey the certificates of stock in the corporations to these trustees with full power and authority to control the corporations, and for a definite time, the lifetime of the trustees or the survivor. On their face, the

instruments have all the earmarks of a complete contract. The parties thereto were competent to contract. There was a subject-matter, there was a legal consideration, and there was mutuality of agreement and mutuality of obligation.

We come then to the question first if the instruments before the Court are void or voidable as being against public policy.

In *Rogers v. Atlantic Life Insurance Co.*, 135 S. C., 89, 133 S. E., 215, 218, 45 A. L. R., 1172, Mr. Justice Stabler, now Chief Justice, quoted with approval from the language used in *Crosswell v. Connecticut Indemnity Association*, 51 S. C., 103, 114, 28 S. E., 200, as follows:

"A sound public policy requires the enforcement of contracts deliberately made which do not clearly contravene some positive law or rule of public morals. * * * Courts should not annul contracts on doubtful grounds of public policy. In such matters it is better that the Legislature should first speak."

In *Weeks v. New York Life Insurance Co.*, 128 S. C., 223, 122 S. E., 586, 587, 35 A. L. R., 1482, the Court had this to say:

"Public policy has been aptly described by one of our judges as 'a wide domain of shifting sands." Gage, J., in *McKendree v. Southern States Life Insurance Co.*, 112 S. C., 335, 99 S. E., 806. The term in itself imports something that is uncertain and fluctuating, varying, with the changing economic needs, social customs, and moral aspirations of a people. Story on Contracts (5th Ed.), § 675; 23 A. & E. Ency. (2d Ed.), 456. For that reason it has frequently been said that the expressive (expression?) public policy is not susceptible of exact definition. But for purposes of juridical application it may be regarded as well settled that a state has no public policy, properly cognizable by the Courts, which is not derived or derivable by clear implication from the established law of the State, as found in its Constitution, statutes, and judicial decisions. *People v. Hawkins*, 157 N. Y.

[1], 12, 51 N. E., 257, 42 L. R. A., 490, 68 Am. St. Rep., 736; *Magee v. O'Neill,* 19 S. C. [170], 185, 45 Am. Rep., 765. Hence since, as was well said by Mr. Justice McGowan in *Magee v. O'Neill, supra*—

" 'It is the duty of the Legislature to make laws and of the Court to expound them, * * * the subjects in which the Court undertakes to make the law by mere declaration (of public policy) should not be increased in number without the clearest reasons and the most pressing necessity.' "

Article 9, Section 11 of the Constitution, is as follows:

*"Election of Officers of Corporations.*—The General Assembly shall provide by law for the election of directors, trustees or managers of all corporations so that each stockholder shall be allowed to cast, in person or by proxy, as many votes as the number of shares he owns multiplied by the number of directors, trustees or managers to be elected, the same to be cast for any one candidate or to be distributed among two or more candidates."

The following sections from the Civil Code of 1932, having the same wording as appears in former Codes, and being in effect at the time the instruments were executed, are cited merely from the Code of 1932:

"Section 7679. *Stockholders' Meetings.*—At all meetings of any company, absent stockholders may vote by proxy, authorized in writing. Every company may determine by its by-laws what number of stockholders shall attend, either in person or by proxy, the form of such proxy, or what number of shares or amount of interest shall be represented at any meeting to constitute a quorum. If the quorum is not so determined, a majority in interest of the stockholders shall constitute a quorum."

"Section 7680. *Cumulative Voting.*—At least one meeting of stockholders of all corporations now chartered, or hereafter to be chartered in this State shall be held annually in this State, at such time and place, and upon such notice as the by-laws may provide. At all stockholders' meetings each

stockholder shall be entitled to one vote for each share of stock held or owned and shall be entitled to vote in person or by proxy for directors, trustees or managers, as provided in Section 11 of Article IX of the Constitution of the State of South Carolina; that is to say, that in the election of directors, trustees or managers of each and every such corporation, each stockholder shall be allowed to cast in person or by proxy, as many votes as the number of shares he owns, multiplied by the number of directors, trustees or managers to be elected; the same to be cast for any one candidate or to be distributed among two or more candidates."

"Section 8192. *Meeting of Stockholders.*—At least one meeting of stockholders of all organizations hereunder shall be held annually in this State, at such time and place and upon such notice as the by-laws may provide. At all stockholders' meetings each stockholder shall be entitled to one vote for each share of stock held or owned, and shall be entitled to vote for directors, trustees or managers; as provided in Section 11 of Article IX of the Constitution and in Section 7680."

"Section 8213. *Proxies, Execution and Limitation.*—No proxy shall be valid unless executed and dated within six months previous to the meeting at which it is issued."

It will therefore be seen that there is no indication in the Constitution and statutes of the State that it is against the public policy of the State for stock in corporations to be held and voted by others than the true owners, but, on the other hand, every statute on the subject, except the statute with reference to railroad corporations, expressly recognize that the stock may be held and voted by one not the owner of the stock. Nor do we read into Section 8213 of the Code of 1932, such a far-reaching conclusion as sought by counsel for appellants. This section deals entirely with a proxy for voting, and while it is intended to limit the life of such proxy to within six months of the meeting at which it is used or published, nothing more can be read into this statute than that

the proxy must have been executed by the person or persons in whose name the stock stands on the books of the corporation within the time limit set therein.

If the instruments create nothing more than voting trusts, are they void as against public policy? There are two distinct lines of cases, the one holding that the separation of the voting power in stock from its beneficial ownership is contrary to public policy and void, the other, than any voting trust which is entered into in good faith and for the promotion and good of the corporation, and thereby necessarily for the welfare and good of all of the stockholders, is valid and enforceable.

The first case on the subject, which we have had the opportunity of examining (and we have read cases "from Dan even to Beersheba"), was decided in 1890, *Bostwick v. Chapman,* a Connecticut case, reported in 60 Conn., 553, 24 A., 32, 42, and known as the *Shepaug Voting Trust cases.* In May, 1891, shortly after the decision in the case of *Bostwick v. Chapman,* the decision in the case of *Cone, Executor, v. Russell,* a New Jersey case, reported in 48 N. J., Eq., 208, 21 A., 847, 850, was rendered.

As stated in an article in Columbia Law Review for November 1922, Vol. XXII, No. 7, by Honorable Marion Smith, of Atlanta, Ga.:

"The vitally important rôle played by these two cases grows out of the clearness and force with which they announce the doctrine, that each stockholder owes to his fellow stockholders a duty in regard to the voting of his stock holdings, and that the law will recognize this duty at least to the extent of not permitting a stockholder to strip himself irrevocably for any period of the power to fulfill it. The basis of the decision in each instance is the interest which each stockholder has in having it within the power of the other stockholders to control the manner in which their stock is voted, and the recognition that the self-interest of the stock-

holders will furnish the only available guaranty that the stock will be voted in the interest of the corporation.

"We have here the foundation of the doctrine that within certain limits the separation of the voting power in stock from its beneficial ownership is contrary to public policy and void. It is a rule to be applied only within well defined limits. As will be later pointed out, there are many instances in which the separation of the voting power from the beneficial interest is justified, and is sustained by the Courts. It is the rule, nevertheless, according to the weight of authority that except within the limits,where such separation is found to be justified, it is contrary to public policy and void."

In *Bostwick v. Chapman, supra,* the Court had this to say: *"It is insisted that there is nothing illegal, per se, in the pooling of stock to carry out a scheme of extension authorized by law and favored by the corporation. This may be true under proper limitations,· and when this is all there is to the scheme;* but when, underlying that pooling contract, there is between the members of the syndicate, who are directors or a majority of the directors of the corporation, a secret agreement which enters into this pooling contract, and forms the object of its creation, and by which they are to take to themselves the profits arising from such extension, or from the contracts which they, as directors, make, elements of unfairness and opportunity for fraudulent and dishonest practices are introduced, which the Court cannot too severely condemn. Such a pooling contract or voting trust is in violation of the most elementary principles of law governing the dealings of trustees with trust property and their *cestuis que trustent."* (Italics added.)

In *Cone, Executor, v. Russell, supra,* Chancellor Pitney stated: "Following the reasoning of these cases, I conclude that the contract complained of in this suit is void as against public policy. This conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, where the object is to carry out a particular policy with the view to

promote the best interests of all the stockholders. The propriety of the object validates the means, and must affirmatively appear."

The New Jersey Courts have, of course, followed the *Cone v. Russell case* and there are quite a number. In North Carolina, Georgia, Illinois, Michigan, New Hampshire, Minnesota, and probably other states, the Courts have generally held that a voting trust separating the voting power from the beneficial ownership is contrary to public policy and illegal, except under extreme circumstances. The Courts of Massachusetts, Virginia, Utah, Maine, Oregon, and New York (in which last-named state a special statute authorizes voting trusts), and probably other states, have adopted a different view and hold that voting trusts separating a voting power from the beneficial interests are not against public policy, and therefore, *per se,* not void and illegal.

One of the leadings cases holding to the minority view, as some text-writers class those upholding voting trust (it is now doubtful if it is the minority view), is that of *Smith v. San Francisco, etc., Ry. Co.,* 115 Cal., 584, 47 P., 582, 587, 35 L. R. A., 309, 56 Am. St. Rep., 119, from which we quote as follows:

" 'Public policy' is a term of vague and uncertain meaning, which it pertains to the lawmaking power to define, and Courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Sir George Jessel, as master of the rolls, said in *Besant v. Wood,* L. R., 12 Ch. Div., 605, that public policy is 'to a great extent a matter of individual opinion, because what one man or one judge might think against public policy another might think altogether excellent public policy.' And in another case *(Printing, etc., Co. v. Sampson,* L. R., 19 Eq., 465) the same jurist said : 'If there is one thing which, more than another, public policy requires, it is that men

of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.' It is not in violation of any rule or principle of law for stockholders who own a majority of the stock in a corporation to cause its affairs to be managed in such way as they may think best calculated to further the ends of the corporation, and for this purpose to appoint one or more proxies, who shall vote in such a way as will carry out their plan. Nor is it against public policy for two or more stockholders to agree upon a course of corporate action, or upon the officers whom they will elect; and they may do this either by themselves or through their proxies, or they may unite in the appointment of a single proxy to effect their purpose. * * *

"The agreement in question cannot be regarded as illegal by reason of being in restraint of trade. The rule invalidating contracts in restraint of trade does not include every contract of an individual by which his right to dispose of his property is limited or restrained. * * *

"Neither is it illegal or against public policy to separate the voting power of the stock from its ownership. The statute authorizes the stockholder to vote by proxy, and it was held in *People's Home Savings Bank v. Superior Court*, 104 Cal., 649, 38 P., 452 [29 L. R. A., 844, 43 Am. St. Rep., 147], that a by-law restricting the selection of proxies to stockholders was invalid, that the statute placed no limitation upon the right of selection, and that a stockholder may appoint as his proxy one who is an entire stranger to the corporation. The right to appear by proxy implies, of itself, that the voting power may be separated from the ownership of the stock; and, unless the authority of the proxy is limited by the terms of his appointment, he is necessarily required to use his own discretion in any vote that he gives."

Another leading case upholding the validity of voting trusts is *Carnegie Trust Co. v. Security Life Ins. Co.*, de-

cided in 1910, reported in 111 Va., 1, 68 S. E., 412, 31 L. R. A. (N. S.), 1186, 21 Ann. Cas., 1287, and is quoted with approval in *Re Pittock's Will,* an Oregon case, reported in 102 Or., 159, 199 P., 633, 202 P., 216, 17 A. L. R., 218. In fact the opinion in the *Pittock case* adopts the second paragraph of the syllabus of the *Carnegie Trust Co. v. Security Life Ins. Co. case,* which is as follows: "An agreement between holders of shares in a life insurance company, to place their stock in the hands of trustees for a period of twenty-five years, to enable the trustees more efficiently to manage the corporation, is not against public policy."

In *Boyer v. Nesbitt,* 227 Pa., 398, 76 A., 103, 136 Am. St. Rep., 890, the fourth syllabus, which is fully warranted by the opinion is as follows: *"Transfer of Stock to Voting Trustees.*—An agreement between the majority stockholders in a corporation and the three directors, whereby the stockholders transfer the legal title and the voting rights of their stock to the directors as trustees, for the term of five years for the purpose of securing a continuation of the business policy of the company organized by the officers then in control of its affairs, is not invalid as opposed to the public policy or statutes of Pennsylvania."

As stated in printed argument of counsel for respondents, a good general statement of the law is to be found in 7 R. C. L., pages 349, 350, and is as follows: "We come now to those agreements whereby stock is transferred to trustees who are required to hold it in trust for the transferrers and to exercise the power of controlling the affairs of the corporation. The decisions passing upon the validity of such stock voting agreements or voting trusts are to the general effect that the agreement is not unlawful in itself, but that its validity depends upon the legality of the purpose for which the agreement is formed. There is, however, a marked lack of uniformity in the cases. Some of them are decided upon considerations as to the nature of irrevocable proxies; others rest upon the statute law of the state in which they are

rendered; yet others assert inseparability of the voting power of stock from its ownership; while very many as stated, rest upon the fraudulent or otherwise objectionable character of the object to be attained. According to a few decisions an agreement by which the voting power of the stock is severed from the beneficial ownership is void *per se,* irrespective of the propriety of the purpose sought to be accomplished in the particular case. So, a pooling arrangement by which stockholders transfer their shares to trustees to be voted as directed by holders of the majority thereof for the period of five years, unless the holders of two-thirds of such stock vote to put an end to the trust sooner, has been held to be contrary to public policy and void as against the right of an assignee of some of the trustees' certificates to have the shares thereby represented issued to him in his own name and under his own control. In considering the cases, however, and the text writers who have commented upon them it is impossible not to be impressed with the change of opinion which has taken place with respect to the true nature of such contracts. In the early stages of the development of voting agreements there was a strong sentiment against them; but experience has demonstrated their usefulness, and the hostility evinced toward them has by degrees diminished. In some states they are specifically authorized by statute. Assuming that the general policy of the law prohibits the separation of the voting power from the beneficial interest, yet such a separation is now deemed to be justified where there is a property interest to conserve, some definite policy in the interest of the corporation to be carried out, some beneficial interest of the stockholders to be served or some purpose not unlawful of an advantageous character to the stockholders to be effectuated."

"It is very generally held or said that voting trusts are not *per se* unlawful; and one of the most familiar illustrations of a voting trust which may be lawful is where the object is to carry out a particular policy, with a view to pro-

mote the best interest of all the stockholders. It is said that the validity of the trust is to be determined by the propriety and justness of the ultimate purposes sought to be accomplished; * * *" 14 C. J., 915.

The instruments herein sought to be declared null and void are not against the public policy of the State, not contravening any statute, and there being a total lack of evidence that they were entered into to serve any illegal purpose, but, to the contrary, to better serve the interests of all of the stockholders and benefit them and the corporations.

Having held that the contracts, be they voting trusts, managing trusts, or trust deeds, are not void, have they become voidable by the acts of the trustees (1) because the trustees held no stockholders' or directors' meetings; (2) because they withheld and refused inspection of books and did not consult the other beneficial stockholders; (3) because they paid themselves large salaries; (4) because, as alleged, they used the corporations for their own advantage and to the injury of other stockholders; (5) because of alleged speculation with funds of the corporations?

In passing upon No. 1, the learned referee, to whom this case was referred, had this to say: "Looking at it from a purely practical standpoint, there would seem to have been little occasion for having such meetings. R. J. and P. R. Alderman after the trust period were the only two legal stockholders, they were both actively running the whole business, giving it their constant and personal attention, were both present and engaged together in the same offices and probably hourly and daily conferring with each other; certainly the corporations have suffered no actual injury by their failure to sit down annually in a formal meeting or at intervals as directors and call themselves to order and keep minutes of what they resolved to do at some special time. The corporations are functioning, regardless of the failure to hold these meetings; are being recognized every-

where as corporations; are being taxed as such by the State and Federal governments and have recognition in all respects as corporations. The only liability to injury by failing to hold their meetings would seem to be the danger of forfeiting their charters, but mere failure to hold the meetings does not work, according to general law, such a forfeiture (9 Fletcher, pp. 9048 and 9123). Moreover, this question is one for the State and not for the casual enforcement by private parties, and until the State shall move it seems to me that the charge that injury has been suffered by their failure to hold such meetings must fail. (See Code 1932, Section 829.)"

We concur in the reasoning and conclusion of the referee.

No. 2. It was held by the referee and concurred in by the Circuit Judge, that while the trustees failed on occasions to give specific information to appellants, yet, from time to time reports were sent out, which were generally regarded as sufficient; that thereafter a committee was named for the purpose of investigating and disseminating information, and that it was within the power of the stockholders to establish such a special committee and to compensate them as any other employees of the corporations for their work. In this we agree.

Nos. 3 and 4. Both the referee and the Circuit Judge held adversely to the contention of appellants in this respect, and there is ample testimony to support the conclusions reached by them.

No. 5. This same subject will be referred to later on the question of the liability of the trustees for losses sustained, but for the moment will be considered from the standpoint of making voidable the trust deeds or instruments in question. Following the death of D. W. Alderman, Sr., it was found that he owned a small amount of bank and warehouse stock in his individual name and the stockholders joined in transferring this stock to D. W. Alderman & Sons Company. From time to time this corpora-

tion acquired by purchase various stock in other corporations, which fact was made known to the stockholders by the statements furnished them, and no objection was made thereto. There is no basis for the suggestion that the trustees did not act in good faith, and that their father, whose policies they were undertaking to carry out, had set the precedent.

We, therefore, hold that the purchase of bank stock by the trustees with surplus funds of the corporation, while being *ultra vires* acts, under the circumstances of this case, did not void the trust deeds.

On all questions of fact raised by the pleadings and testimony, and from which exception has been taken, the referee and the Circuit Judge have concurred, and are supported in their findings by the evidence.

In *Austin v. Goddard,* 164 S. C., 20, 161 S. E., 767, 769, this Court definitely held, in the language hereinafter set forth, that in an equity case where the findings of fact of the referee are concurred in by the Circuit Judge, such findings will not be disturbed on appeal, unless there is no evidence to support them, or such findings are against the clear preponderance of the evidence. The following is taken from said case:

"It is the settled law of this State that in an equity case findings of fact by a master concurred in by a Circuit Judge will not be disturbed on appeal unless it is shown that such findings are without any evidence to support them or are against the clear preponderance of the evidence. *Youmans v. Youmans,* 128 S. C., 31, 121 S. E., 674; *Cohen v. Goldberg,* 144 S. C., 70, 142 S. E., 36; and *Kaminski Hardware Co. v. Holden Trunk & Bag Co.,* 150 S. C., 244, 147 S. E., 874.

"The master in this cause saw and heard the witnesses.

"The Circuit Judge, after extensive arguments and a careful consideration and study of the testimony, records, and exhibits, concurred in those findings. The issues are close. We

cannot say, however, that these conclusions are without evidence to support them or are against the clear preponderance of the evidence.

"Counsel for appellants have earnestly and ably argued their view of the law and the facts of this case, and we have been seriously impressed by them. Were this matter before us on a trial *de novo* and we were free to draw original conclusions from the testimony, their view would have great weight. All of their exceptions herein have been given careful consideration. We think, however, that, under the decisions of this Court, it is our duty to sustain the decree appealed from."

Are the trustees liable for the losses resulting from the purchase of stock in other corporations? This will be determined by if at the time of the transactions they were handling funds belonging to the *cestuis que trustent* or to the corporations. If to the former, the law will hold them responsible to their *cestuis que trustent* for their negligence and mismanagement regardless of intent and good faith; if the latter, then their liability will depend upon such right of action as the corporation would have against them as directors.

The funds invested in stock of other corporations represented a surplus on hand of D. W. Alderman & Sons Company. While all of the stockholders of the corporation had a beneficial interest in said surplus, yet, until a dividend had been declared, it remained the property of the corporation and was not funds in the hands of R. J. and Paul R. Alderman as trustees to be paid over to the respective *cestuis que trustent*. It must be recognized that R. J. and Paul R. Alderman were acting in the dual rôle of trustees for appellants and as officers and directors of the corporations. The funds invested being the property of the corporations, necessarily their liability for losses incurred is that of officers and directors and not as trustees.

The special referee, for whose ability as a lawyer the writer hereof has great respect, has well covered this phase

of the case in his report, and we quote therefrom with approval the following:

"As developed in the testimony, this charge refers primarily to purchases in the year 1929 of stocks in the Guaranty Trust Company (of New York) and the National City Bank of New York. Exhibits 34 and 'EE' show that they bought forty (40) shares of the Guaranty Trust Company and seventy (70) shares of the National City Bank, and in selling them in 1932 lost $55,851.02. The testimony of R. J. Alderman with regard to this transaction is found on pages 11, 14, 16 and 83 of 'A.' He testified that their purpose in buying stocks of other companies was that they considered that they were a good investment; that they were faced with the fact that they would have to pay a back income tax and that he thought it would be a good idea to put the money in the stock and that they would make some money thereby; that they had a perfect legal right to buy the stocks both under the trust deeds and under the law as a corporation; that they made the purchases as investments and not as speculations and on page 16-A occurs this:

" 'Q. Did you have anybody's advice or suggestions for the sale? A. I took my own advice and my brother's. We have always run this business since the trust period on our own advice, the responsibility is ours, and we have assumed it.

" 'Q. And when you bought this stock in New York you bought it on your and your brother's judgment? A. Yes, sir.

" 'Q. You didn't buy on Mr. Shaw's judgment? A. No, sir.

" 'Q. Or on your sister's judgment? A. No, sir.

" 'Q. You didn't ask for their advice? A. No, sir, never asked for their advice about anything.

" 'Q. Then you bought some other stock? A. Peoples State Bank, $1,000.00. It cose $120.00. They issued it $100-.00 par and $20.00 surplus.

" 'Q. Have you been assessed? A. I am looking for it.'

"The decision as to the liability for this transaction has perplexed me more than any other question in this case, depending as it does largely upon what facts the emphasis is placed upon. I am satisfied of the good faith of the officers or trustees. I think there is no question of this and that they were seeking what they regarded as the best interest of their company. They, themselves, of course, were financially as much interested in the success of the companies as any of the other stockholders and what benefited the companies directly benefited them also and vice versa. From the testimony it will be seen that this was an original investment brought about by no imperative necessity of the moment. It was not entered into because it was the only way to save a debt or to avoid a loss to the company as are distinguished and justified in many cases, investments that otherwise would not be considered proper.

"The general rule in the United States is stated to be:

"Fletcher on Corporations, Vol. 4, p. 2067:

" 'The prevailing doctrine is that a corporation has no power either to subscribe for or purchase shares of stocks in another corporation unless such power is expressly conferred upon it by charter or of statute, or unless the circumstances are such that the transaction is a necessary or reasonable way of carrying out or accomplishing the objects for which it was created. Moreover, purchases of stock of other corporations have been held to be contrary to public policy in addition to being beyond the power of the corporation.'

"The charter of the Railroad Company contains the usual powers granted to railroads and that of the Lumber Company —the 1901 charter—empowered it 'to manufacture, buy, sell timber and lumber, to buy and sell real estate, to engage in farming and merchandising, and to operate a general repair shop for machinery.' Of course besides the concrete powers granted there are incidental powers inherent in the expressed

grant in many instances, and it is evidently very difficult for the Courts to lay down any definite rule with regard to what incidental powers may be carried in a charter, there being decisions varying with the circumstances. The same authority above quoted in the discussion of this (see volume 4, page 2072, Section 1121) gives the following as the author's conclusion:

" 'Although some of the decisions already cited in this section tend to establish a contrary rule, it would seem to be a better rule that a corporation may purchase stock in a corporation in aid of its business where it would have the power to buy all the product of such corporation.'

"I do not see, however, that even under this broad rule the purchase of bank stocks could be strictly justified, and the transaction seems to me to be *ultra vires.* This, however, does not necessarily mean that the officers and directors would be personally responsible. Corporations frequently overstep their legal limitations and it depends very much upon the object sought in the inquiry as to the result of *ultra vires* acts. Officers and directors of a corporation occupy a fiduciary relation to the corporation and in some ways to the stockholders but their duty and liability are not entirely those of trustees. The money for instance in this case belonged to the corporation, not to the directors, and the action in the purchase was the action of the corporation. Their duty was to manage the corporation for its best interest according to their judgment, arrived at honestly and with due care. The fact that the corporation is acting *ultra vires* does not necessarily make the officers, through and by whom it acts, responsible personally. They are still its agents and any personal responsibility must be traced to their negligently or intentionally acting contrary to the power of the corporation.

"It is urged in this case that in making the investment in bank stocks not only was the act *ultra vires,* but it was contrary to the statute law of South Carolina. In the general

provision as to private corporations: Chapter 153 of the Code of Laws, § 7677, subdivision 5, it is provided:

" 'No part of the capital stock or any of the funds of such corporations shall, at any time during the continuance of their charter, be used or employed, directly or indirectly, in banking operations, or for any purpose whatsoever inconsistent with the provisions of their respective charters'—a provision that was enforced in the case of *White v. Commercial & Farmers' Bank,* 66 S. C., 491, 45 S. E., 94, 97 Am. St. Rep., 803. There a corporation bought stock in a bank and it was held that the transaction was so far illegal that no relief based upon the recognition of the contract would be allowed. It may be that when this provision is considered by the Court, it will be found that the reason of the law, is that in South Carolina a different degree of responsibility is required of stockholders in banks and to permit business corporations to engage in banking would nullify this constitutional requirement, and that therefore the true intent is to prohibit investments by business corporations in South Carolina banks, and that an investment in stocks of foreign banks is not prohibited. As it is written, however, it is a strict prohibition, and taking it at its face value, as I must, it comes to this—that the investment was illegal and beyond the power of the corporation. What then are the effects?

"Stocks and Stockholders, Hellewell, p. 487, § 260:

" 'Where directors or other officers have with knowledge exceeded the power of the corporation, they are personally liable for any loss which may arise therefrom unless the corporation has subsequently ratified the action taken.' Citing authorities.

"Fletcher, Cyc. Corporations, Vol. 4, p. 3685, §§ 2436 and 2437:

" '2436. Reasonable care as immaterial. If the liability of a corporate officer is based on the alleged fact that he has acted beyond his powers or beyond the powers of the cor-

poration, or in violation of a statute or the charter or by-laws, the test of reasonable care which applied when he acts within his powers has nothing to do with the question of liability except insofar as such care bears on whether he should have known that the acts in question were *ultra vires* or expressly forbidden or beyond his powers. If he knowingly exceed his authority or the authority of the corporation, he is liable without regard to exercise of reasonable care. In a Missouri case, directors of a bank had loaned to one person more than one-fourth of the capital, in violation of a statute which, however, imposed no penalty for its violation. It was contended that no liability existed "for the reason that the acts prohibited are not such as would make them liable at common law, and no penalty is fixed for the violation of the statute, and the acts charged were not charged to have been done negligently, fraudulently or corruptly." It was held sufficient that there was a violation of the statute, with loss to the bank, without regard to any negligence, on the theory that every violation of law is a breach of duty and that directors are liable to the company for all losses occasioned by any flagrant breach of their duty.'

" '2437. Materiality of fact that act is forbidden by statute or charter. If acts are expressly prohibited by the charter or a statute, but liability for violation thereof is not imposed on corporate officers by the charter or statute, *the doing of such an act does not make the officers personally liable merely because the* act is a violation of the charter or a statute. So far as liability of directors to the corporation is concerned, it has been said that the liability "for damages caused by unauthorized acts rests upon the common law rule which renders every agent liable who violates his authority to the damage of his principal. A statutory prohibition is material under these circumstances merely as indicating an express restriction placed upon the powers delegated to the directors when the corporation was formed." Moreover, an officer of a corporation is not liable to the corporation for damage

merely because he violates a statute, but it must be shown that he was acting as agent of the corporation in so doing.

"7 R. C. L., p. 476, § 456:

" *'Basis of Liability.*—The liability of officers to the corporation for damages caused by negligent or unauthorized acts rests upon the common law rule which renders every agent liable who violates his authority or neglects his duty to the damage of his principal. It seems to be now universally agreed that, no matter whether the act is prohibited by the charter or by-laws, the liability is on the ground of violation of authority or neglect of duty.

"Unless, then, some excuse appears in the testimony I do not see how the conclusion that the directors are responsible to the corporation for the losses due to this investment can be avoided. In my judgment, however, there are justifying circumstances. See Fletcher, Vol. 4, Sec. 2438, Sec. 2441. In the first place, the charter provisions are about as general as can be imagined and the powers given very broad. R. J. Alderman as a business man might well have believed as he testified, that the corporation had the power to buy the stock; secondly, since 1895 (see Ex. 'EE') the corporation had been buying all sorts of corporate stocks, including bank stock, amounting, not including those now in question, to $146,830.00, and no one had ever made any objection thereto—a practical construction of the powers of the corporation that certainly would be cogent in leading one conversant therewith to believe in the existence of the right of the corporation to buy stocks. It is true that a large portion of these transactions occurred during the time of D. W. Alderman, Sr., though I do not see that this fact would alter the force of the practice. Indeed, in the light of the very high respect exhibited by the directors as well as by all the parties to this suit for the views of D. W. Alderman, Sr., this probably furnished a stronger reason for the belief in the right to make the investments. Thirdly, but since the stock has been owned by the children up to 1929 these corporations have

bought without any protest from any one so far as is shown in the evidence, fifty shares in the Home Bank & Trust Company, 150 shares in the Bank of Olanta, and various shares in the Farmers and Merchants Bank, the amount of which I am not able to determine from the statement, and one share in the North Carolina Bank and Trust Company (see Ex. 'EE') without protest on the part of any of them. Fourthly, the annual statements for years have carried as a regular item 'Stocks in Other Companies' with varying amounts set out in the asset column, and giving express notice to the stockholders of dealings in stocks, all without raising any objection among them. (See Ex. 16). Fifthly, when D. W. Alderman, Sr., died he owned not only real estate but bank and other stocks, and all of his children joined in conveying the stock along with the real estate that he had to the lumber company. It is hard, therefore, for me to see how the corporation in view of its action for more than thirty years could now undertake to hold its directors personally accountable for continuing these long-standing practices, and how the individual stockholders can object, when they have heretofore acquiesced in and have actually actively participated in causing the corporation to do exactly what they are now complaining of its directors having it to do. I have already stated that I was convinced of the *bona fides* and honesty of purpose on the part of the directors and it seems to me that the equity of the situation precludes requiring of the directors to make good the loss suffered by this investment."

In passing upon this portion of the referee's report, the learned Circuit Judge had this to say:

"In addition to the grounds upon which the Referee founded his finding and conclusion adverse to the plaintiffs upon this phase of the case, the above question should be answered in the negative for other reasons.

"This is a suit in equity brought for the primary purpose of having the agreements referred to declared to be null and

void. The stock transaction is listed in the complaint among a number of alleged acts of mismanagement by which the plaintiffs sought to show that the trusts had been breached. To serve the primary purpose of the suit was the main object for including the stock transaction among the allegations of mismanagement. The item is involved in an accounting of a stewardship—a matter peculiarly of equitable cognizance which cannot be determined by legal considerations alone. Equity will not ignore the presence of diligence, good faith and honesty of purpose and belief and will not refrain from giving weight to these elements except under the compulsion of legal necessity. That no such necessity exists in this instance, is shown by the following authorities:

" 'It is well settled that, where reasonable care and diligence and good faith have been exercised, the directors are not liable for losses resulting to the corporation from mere errors of judgment on their part. While their undertaking implies a competent knowledge of the duties of the agency assumed by them, as well as a pledge that they will diligently supervise, watch over, and protect the interests of the institution committed to their care, they do not undertake that they possess such a perfect knowledge of the matters and subjects which may come under their cognizance, that they cannot err or be mistaken either in the wisdom or *legality* of the means employed by them. So it is to be remembered that the directors have the same interests to protect and subserve as other stockholders, and self-interest naturally prompts them to look after their own. *The mere fact that a corporation is carrying on a business which is ultra vires will not render one of its officers liable to it for losses caused by his error of judgment in matters pertaining to such business. So directors are not liable for entering into any contracts in violation of the charter of the corporation, if the mistake did not arise from the want of such care as an ordinarily prudent man takes with his own affairs.' "*

This statement of the rule is fully sustained by the following decisions: *Godbold v. Branch Bank,* 11 Ala., 191, 46 Am. Dec., 211; *New Haven Trust Co. v. Doherty,* 75 Conn., 555, 54 A., 209, 96 Am. St. Rep., 239; *Hun v. Cary,* 82 N. Y., 65, 37 Am. Rep., 546; *Appeal of Spering,* 71 Pa., 11, 10 Am. Rep., 684; *North Hudson Mutual Bldg. & Loan Association v. Childs,* 82 Wis., 460, 52 N. W., 600, 33 Am. St. Rep., 57; *Hodges v. New England Screw Co.,* 1 R. I., 312, 53 Am. Dec., 624; *Wallace v. Lincoln Sav. Bank,* 89 Tenn., 630, 15 S. W., 448, 24 Am. St. Rep., 625; *Smith v. Cornelius,* 41 W. Va., 59, 23 S. E., 599, 30 L. R. A., 747; *Warren v. Robison,* 19 Utah, 289, 57 P., 287, 75 Am. St. Rep., 734; *Holmes, Booth & Haydens v. Willard,* 125 N. Y., 75, 25 N. E., 1083, 11 L. R. A., 170; *Marshall v. Farmers' & Mechanics' Sav. Bank,* 85 Va., 676, 8 S. E., 586, 2 L. R. A., 534, 17 Am. St. Rep., 84."

We now come to the question if the contracts or trust deeds are revocable.

"A voluntary trust deed properly executed, with knowledge of the nature of the act, without reservation of power to revoke, is irrevocable. * * *" 26 R. C. L., 1207.

This statement of the rule is supported by a long list of cases unnecessary here to cite to be printed.

"Shares of corporate stock being regarded as property, the owner of such shares may, as a general rule, dispose of them as he sees fit. * * * Although there are cases which appear to recognize the principle that the right to alienate stock is derived from statute or the corporate charter, as a general rule it is assumed that this right is incidental to the ownership of the shares, and is based upon the broad ground that such shares are characterized by the same features as other forms of property." 14 C. J., 663, 664.

"One of the main incidents of property is its transferability. The power of disposing of stock, like the power of disposing of any other property, is a common right, and necessarily attaches to ownership." 7 R. C. L., 261.

A long line of decisions is cited supporting the above statement of the law.

"Persons may enter into whatever contracts they see fit, which are not ·illegal, immoral or against public policy." First Syllabus, *Philadephia Storage Battery Co. v. Mutual Tire Stores,* 161 S. C., 487, 159 S. E., 825.

That the parties to the contract before the Court were competent to enter into a contract is not an issue. The only real issue raised by appellants not hereinbefore passed upon is that there is no consideration to support the contract.

"While one who signs an instrument of writing under seal is allowed to show failure of consideration, he is not allowed, in the absence of fraud, to show that such instrument was without consideration, the reason being that the seal, of itself, imports a consideration. *Carter v. King,* 11 Rich., 125; *Brown v. Brown,* 44 S. C., 378, 22 S. E., 412; *Whitmire v. Boyd,* 53 S. C., 315, 31 S. E., 306; *Koster v. Welch,* 57 S. C., 95, 35 S. E., 435; *Cook v. Cooper,* 59 S. C., 560, 38 S. E., 218; *Baynard v. Ulmer,* 153 S. C., 100, 150 S. E., 610." *Bank of Charleston v. Oates et al.,* 160 S. C., 188, 158 S. E., 272.

In the case of *Fuller v. Missroon,* 35 S. C., 314, 14 S. E., 714, 718, the Court had under consideration a trust deed, and one of the questions involved was whether or not the recital of a consideration of $5.00 estopped the heirs of the grantor from claiming a reverter. In passing upon this question, the Court said: "While it is true the only evidence of this payment is in the recital of the deed itself, yet the only person who could gainsay it would be a creditor of the grantor. It would certainly bind his heir so as to prevent a reverter. A very slight circumstance in the way of consideration, even if it be 'a pepper corn,' our own Courts de-

clare, will be sufficient evidence of the intention of the parties to carry the whole estate."

The mere fact that an instrument is executed under seal imports a consideration, but in addition to this a sufficient consideration is shown when the services of R. J. and Paul R. Alderman were procured to manage the corporations and make such management their life work. From the record of achievement as disclosed by the testimony, we venture to suggest that it has been not only a good consideration, but a valuable consideration. It is true that these managing trustees have drawn substantial salaries, but it was no doubt contemplated by the parties to the contracts that the trustees would receive substantial salaries, and no objections were ever made of these salaries until the commencement of this action.

In passing upon the revocability of these contracts, the intention of the parties thereto should be ascertained by the Court from the instruments, and effect given to such intention.

"The object of construction as to deeds—in fact, as to all papers in contest before the Courts—is to reach the intention of the parties, because it is this which must control; otherwise the contract would be the contract of the Court and not of the parties." *McCown v. King,* 23 S. C., 232, 233, 235.

In *Three States Coal Co. v. Mollohon Mfg. Co.,* 137 S. C., 345, 135 S. E., 380, 382, a case involving the construction of a contract, Mr. Justice Stabler (now Chief Justice) had this to say: "Certain well-established rules are followed by the Courts in the construction of written contracts. The purpose of all rules of construction is to ascertain the intention of the parties to the contract, and in ascertaining this intention the whole instrument should be considered and effect given, if practicable, to every clause and word in it. *Smith v. Clinkscales,* 102 S. C., 227, 85 S. E., 1064, and *Stewart v. Morris,* 84 S. C., 148, 65 S. E., 1044."

Later in the same case, Justice Stabler quoted from *Merrill-Ruckgaber Co. v. United States,* 241 U. S., 387, 36 S. Ct., 662, 60 L. Ed., 1058, which was also quoted with approval in *Chatfield-Woods Co. v. Harley,* 124 S. C., 280, 117 S. E., 539, the following language: " 'In construing a contract, the Court will ascertain the intention of the parties, and to that end will, as far as possible, ascertain the situation of the parties, as well as the purposes had in view at the time the contract was entered into.' "

A careful reading of the instruments before the Court can lead to but one conclusion, and that is, that it was the intention of the parties at the time of the execution of the instruments involved in the case at bar, for said instruments to continue in force for the lifetime of R. J. and P. R. Alderman and/or the survivor, as it is plainly and unequivocally stated therein. There is no suggestion throughout the instruments that it was intended that the powers and rights conveyed could be revoked at the pleasure of the grantors, and it cannot be presumed that R. J. and Paul R. Alderman would have accepted the trust if the grantors could revoke same at any time.

We fail to recognize the "Family Settlement" doctrine as a basis for sustaining the decree of the Circuit Judge, but on the other grounds upon which he based his decree, and for the reasons herein given, the judgment of the Circuit Court is affirmed.

This Court has passed upon all exceptions to the decree of the Circuit Judge, but has not undertaken to pass upon the positions taken in the arguments before this Court but not taken before the Court below.

In addition to the main appeal, there is an appeal from the order settling the case on appeal. Following the exceptions, it is stated that this Court would be furnished the proposed brief of evidence and exhibits, which it is contended was all that was necessary to print as the transcript of record. This has not been done, and therefore the Court is without suffi-

cient information to pass upon the exceptions. Under the rule of the Court, these exceptions are presumed to be abandoned.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BONHAM and FISHBURNE concur.