**NETTLES v. RHETT et al.**
No. 747.

District Court, E. D. South Carolina.
June 25, 1937.

Darlington, S. C., and Geo. L. Shearer, of New York City, for defendants.

MYERS, District Judge.

This is an action originally brought in the state court against the defendant stockholders of Peoples Investment Corporation to enforce payment of asserted secondary liability of 74,000 shares of stock of defunct Peoples State Bank of South Carolina, of record on the stock book of the bank in the name of investment corporation when the bank failed on December 31, 1931.

Peoples State Bank is now in liquidation, with receivers appointed by this court. In other proceedings in the state court, under South Carolina practice, plaintiff was appointed receiver to enforce and collect the superimposed liability to the amount of the par value of the stock as provided by the Constitution and statutes of South Carolina for the benefit of depositors; and in this suit, in the state court, judgment was obtained against investment corporation for the full amount of the liability, $740,000, upon which judgment an execution was issued, and nulla bona return made.

The present action, duly authorized, was then instituted in the state court, and the cause removed to this court by the nonresident defendants, Bernard M. Baruch and Montague Timber Corporation. Plaintiff then moved to remand, on the ground that the liability asserted was joint and several, which motion was refused. See Nettles v. Rhett et al. (D.C.) 14 F.Supp. 594.

On the hearing on the merits, defendants offered no testimony. The case as made reveals the following historical and other pertinent facts:

In 1928, Peoples National Bank (later Peoples First National Bank), with main office and branches located wholly in the city of Charleston, S. C., was operated by R. G. Rhett and others of the defendants as officers and directors, designated by the plaintiff as "the Rhett group," and so referred to hereinafter.

On November 9, 1928, "the Rhett group" organized and secured a charter for Peoples Bank of Columbia, S. C., with R. G. Rhett, Jr., as chairman of the board. The authorized capital stock of this bank was increased from time to time, and on May 14, 1929, was fixed at $500,000, and change of name authorized to Peoples State Bank of South Carolina, at which time a merger and

Stephen Nettles, of Greenville, S. C., Eugene S. Blease, of Newberry, S. C., and John I. Cosgrove, of Charleston, S. C., for plaintiff.

Mitchell & Horlbeck, Buist & Buist, Stoney, Crosland & Pritchard, Huger, Wilbur, Miller & Mouzon, Nathans & Sinkler, L. K. Legge, and Hagood, Rivers & Young, all of Charleston, S. C., Legare Walker, of Summerville, S. C., Samuel Want, of

consolidation with other state banks was allowed, and on December 4, 1929, the capital stock was increased to $1,000,000. On February 27, 1930, resolutions adopted December 23, 1929, were approved, with authority to increase the capital stock to $2,-000,000, to purchase the assets of the Peoples First National Bank, and to change the principal place of business to the location of the latter existing institution in the city of Charleston.

Prior to that time, Peoples State Bank and Peoples Securities Company, a general investment and securities corporation controlled by the same interests, had bought largely of stock of other state banks. The financial statement of Peoples Securities Company as of January 31, 1929, showed a holding of stock exceeding $500,000 value in eleven state banks—seven of which banks were included in the merger with Peoples State Bank on May 14, 1929.

At a meeting of directors of Peoples Securities Company on January 21, 1929, the following resolution was adopted: "The President explained that by reason of our company having purchased bank stocks, exclusive of Peoples First National Bank of Charleston, aggregating $445,214.23, it was deemed expedient to form the Peoples Investment Company for the purpose of relieving the Peoples Securities Company of having such a large amount of bank stocks. Mr. Rhett read a prepared proposal for the incorporation of the new company with an authorized capital of $1,000,000, it being the purpose of first issuing $500,000 common, payable over a period of six years, and $500,000, 6½ per cent preferred."

Pursuant to this resolution, Peoples Investment Corporation was chartered March 28, 1929, with an authorized capital of $1,-000,000, and with the following charter provision: "The purpose of the corporation is to buy, sell, own, hold, control and deal in stocks, bonds, notes, mortgages, commercial paper and choses in action of all sorts; to finance the operation of any corporation, partnership, or any individual in any business enterprise; to buy, own, lease, sell, improve and develop real estate, and to buy and sell any kind of property or thing of value of any kind whatsoever; to act as trustee; to do any other act or thing necessary or convenient for the purposes of the said business above set forth, or to any branch thereof. And the corporation claims the benefit of all rights, and privileges conferred by any and all of the general laws of the State of South Carolina on business corporations."

Of the capital stock of Peoples Investment Corporation, divided by resolution into 5,000 common and 5,000 preferred shares, the entire common stock was subscribed to by fourteen persons, all officers, directors, or employees of Peoples State Bank. The 40 per cent. subscription call was met in cash by two of the subscribers, and by the remaining twelve by transfer to investment corporation of stocks held by them in various state banks other than Peoples State Bank, and the payment by or to them of cash in equalization of the difference between agreed value of the stocks so transferred and the subscription call.

The banks whose stocks were so acquired, and in which additional shares were subsequently acquired from various sources by investment corporation, were subsequently absorbed by and merged with Peoples State Bank. The agreed value of these stocks in each instance and the amount paid therefor by the investment corporation was well above par, and there is no evidence to refute the appearance at that time of the complete and entire stability and solvency of each of such banking institutions.

There is evidence that Peoples State Bank financed investment corporation in acquiring the stock of the various subsequently merged banks; and from the fact that some of the officers, directors, and employees of Peoples State Bank holding investment corporation stock were largely indebted to the bank when it closed, it may be inferred that Peoples State Bank financed for them the payment of subsequent calls on their stock in investment corporation—which corporation was indebted to the bank, when it closed, in the sum of $41,000 unsecured.

It is further shown that Peoples Investment Corporation's holdings throughout consisted solely of bank stock, and finally, as its entire holdings, the 74,000 shares of the Peoples State Bank in question. The nature of its business, as set out by its secretary in its income tax return, was that of a holding company, and it was so designated by the auditors of the State Banking Department in their audit of the closed Peoples State Bank. Other evidence of its existence as a holding corporation was offered in the nature of a circular so stating, found among the corporation's records, though without other authenticity as to date of preparation and without evidence of its distribution.

The South Carolina law relating to private corporations contains the following provision, section 7677, par. 5, Code 1932: "No part of the capital stock or any of the funds of such corporation shall, at any time during the continuance of their charter, be used or employed, directly or indirectly, in banking operations, or for any purpose whatsoever inconsistent with the provisions of their respective charters."

The Supreme Court of South Carolina, in White v. Bank, 66 S.C. 491, 45 S.E. 94, 98, 97 Am.St.Rep. 803, affirmed in Alderman et al. v. Alderman et al., 178 S.C. 9, 181 S.E. 897, 105 A.L.R. 102, held that this section was a bar to recovery against a private corporation of statutory liability on bank stock, on the ground that the purchase of the stock by the corporation was an ultra vires act and that it could not be made liable on a contract which it was prohibited by law from entering into. The question of secondary liability of the stockholders of the corporation was not before the court in either one of these cases.

It would seem that the charter rights of the investment corporation, as expressed in the provision above quoted, were broad enough to permit both the financing of the operations of any other corporation and the holding, buying, selling, and owning of stocks of any nature or kind. In White v. Bank, supra, however, it is held that "the charter * * * should be read with this provision [South Carolina Code 1932, § 7677, par. 5] as written in it. If [it] had not been prohibited from subscribing to the capital stock of the bank, it would nevertheless under the general law have been prohibited from doing so." See, also, Dunn et al. v. O'Connor et al. (App.D.C.) 89 F.(2d) 820. Discussing the subscription by the corporation to the stock of the bank, the court refers to it as an ultra vires contract. The Circuit Court decree, affirmed, says: " 'The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.' Central Transp. Co. v. Pullman's Palace Car Co., 139 U.S. 24, 59, 60, 11 S.Ct. 478, 35 L.Ed. 55; Jacksonville, etc., Ry. Co. v. Hooper, 160 U.S. 514, 524, 530, 16 S.Ct. 379, 40 L.Ed. 515; California Bank v. Kennedy, 167 U.S. 362, 368, 17 S.Ct. 831, 42 L.Ed. 198."

The affirming opinion reviews the Pullman's Palace Car Co. Case, and other cases cited, and holds: "The foregoing cases show that a contract which is ultra vires cannot be made the foundation for the liability of the corporation, and, furthermore, that a corporation cannot be made liable on a contract which the law prohibits it from entering into. When the Rock Hill Real Estate & Loan Company purchased the shares of stock in the Commercial and Farmers' Bank, it was in violation of the statute. The court will not lend its aid in the enforcement of rights growing out of a contract expressly forbidden by statute, but will leave the parties to the unlawful contract where its finds them." A. H. White v. Commercial & Farmers' Bank, 66 S.C. 491, at page 513, 45 S.E. 94, 102, 97 Am.St. Rep. 803.

But the court evidently considered unnecessary and to no purpose a discussion of the theory of the right of recovery resting upon a disaffirmance of the contract, the bank whose stock was subscribed to by the corporation being insolvent.

Clearly, the investment prohibition of the corporation statute was for the protection of corporate stockholders, to protect them from possible loss on their investment or through demand for the superadded liability. No penalty is imposed by the act upon the officers of the corporation or anyone else.

In the original action by the receivers on stockholders' liability, the investment corporation did not set up the defense indicated in the White Case as available to them. It had no other assets, and judgment was entered by default.

The liability under the South Carolina law has universally been held to be based upon a contract by a subscriber to respond to the liability if established. It would seem logically to follow that no right of action could be based on the unlawful subscription by the investment corporation and the unlawful issuance of stock in the name of the investment corporation by the bank. However, the established rule is that such a transaction is ordinarily against public policy, and that, where secondary liability for the statutory protection of depositors can be established under any applicable authority, it should be enforced.

It would be a useless task to cite and discuss at length the South Carolina decisions on the question of secondary liability with

respect to the right of recovery against the true owner of the stock. In every instance, however, where the right to recovery was not based upon the failure of the transferree of stock to comply with the law as to actual transfer on the books of the bank, it was based upon evidence of transfer to a person who could not assume and relieve the transferree from the contractual liability, or upon evidence of actual or constructive fraud in an effort to avoid the liability.

Before passing to a consideration of the secondary liability of the stockholders of Peoples Investment Corporation, I desire to record the observation of a number of years' experience in a large number of cases, that the superadded liability has been a prolific source of litigation, with very little benefit to depositors in insolvent banks; and the further observation that the idea of the courts, expressed in some of the cases, that bank depositors give any thought to the superadded liability as protection to them has very little justification. All of which, however, has no bearing upon the theory of the law and the enforcement thereof in proper cases. That this observation and conclusion was general is evidenced by the fact that, since the failure of the Peoples State Bank, the electorate of this state has repealed the constitutional provision (Const. S.C. art. 9, § 18, as amended [see 39 St. at Large, p. 35]), and by action of the legislative body the superadded liability of holders of bank stock has been abolished. (Act S.C. Feb. 21, 1935, 39 St. at Large, p. 46). This has also been done in other jurisdictions, and by act of Congress as to national banks (12 U.S.C.A. § 64a).

In another case brought by the plaintiff, Joseph L. Nettles, Receiver, v. Albert Sottile et al., as Stockholders of Palmetto Brokerage Company, 191 S.E. 796, the Supreme Court of South Carolina filed its opinion April 14, 1937, and held that the judgment previously obtained by plaintiff receiver against the Palmetto Brokerage Company was not a bar to the action against Sottile and other stockholders on the asserted secondary liability. The Supreme Court also held that the asserted liability was several and not joint, as was held by this court in the opinion refusing to remand, supra. These two points urged in argument have been disposed of adverse to the plaintiff, and will not be further discussed.

This brings us to the consideration of whether the stockholders of Peoples Investment Corporation can be held for the asserted secondary liability on the stock issued to the corporation in proportion to the stock of the corporation owned by them as the true and beneficial owners of the stock; and, if so, whether the holders of preferred stock stand in the same class and are equally liable with owners of common stock of the corporation. The argument that the law contemplates that bank stock be held by one legally capable of holding the same and legally bound to respond to assessments thereon, and who may lawfully assume the liabilities attaching thereto, is amply supported by the authorities. See Conner v. McSween, 164 S.C. 438, 162 S.E. 434, 436, in which case, however, it is also held: "In order for a transfer of bank stock to be valid as to depositors, it is not necessary that the transferee shall be financially able to meet the obligation, but only that he shall be legally capable of assuming it as binding."

This and other similar cases in our state reports have reference to transfers and avoidance of the contractual liability of the transferree, and give us no light in the instant case.

The opinion by Mr. Justice Bonham in Nettles v. Sottile, supra, modifies the decree of the Circuit Court and establishes the law of South Carolina in reference to corporate stockholders' liability on corporation holding of bank stock. The particular question here presented is not decided, as not involved, but is adverted to in its modifying provisions in such manner as to guide us in disposing of the questions to which our consideration is thereby narrowed. I find it necessary to quote the opinion at length. The court says (pp. 808 and 809 of 191 S.E.):

"The court is satisfied with the disposition made by the circuit decree of the issues made by the exceptions, except as to certain modifications hereinafter set forth.

"In other words, the court is satisfied with the conclusion that the plaintiff had the right to bring this action, and that he is not debarred from maintaining it by reason of having made an election of remedies. The court likewise concurs in the conclusion reached by the circuit court to wit:

" 'The ownership of bank shares by a private corporation in South Carolina is not valid and legal, but, on the contrary, is illegal and void. A court of equity, therefore, will look through the corporate entity of the corporation to the real owners of the bank shares, to wit, its stockholders, and assess

against them the liability attaching to the ownership thereof.'

"If this language be confined in its application to this case alone, there is no question of its pertinency; nor is there a doubt that it is a sound proposition of law in its proper application. The circuit court has reached the conclusion, and we concur in it, that the Palmetto Brokerage Company was organized as a holding company and that the 900 shares of the stock of the Peoples State Bank of South Carolina held by Albert Sottile were assigned to the said Palmetto Brokerage Company for the purpose of evading the statutory liability attaching to such ownership. So far so good.

"But in the treatment of this issue the circuit judge has made certain pronouncements of law which to us seem to be too broad in principle, and which seem not to be necessary to the determination of this case.

"Let it be borne in mind that this court approves the rule declared by the circuit court, to wit:

"'Where the corporate form of organization is adopted or a corporate entity is asserted *in an endeavor to evade a statute or to modify its intent,* courts will disregard the corporation or its entity and look to the substance or reality of the matter.' (Italics added.)

"But the circuit decree states this:

"'The use of the corporate entity for the purpose of holding bank stock is a development of comparatively recent origin. As a matter of fact, I have been cited to no cases involving a corporation used as a holding company for bank stock prior to the debacle of 1929. In every considered case, however, in which this question has been raised, the courts have not hesitated to disregard the corporate identity, *regardless of the particular plan or schedule in use,* and attach the liability to the true owners of the bank shares.' (Italics added.)

"If, by the words we have italicized above, the circuit court meant to limit its language to cases in which a corporation has held the stock as a 'plan or scheme' to evade liability, or perpetrate a fraud, with such application we have no fault to find; but, if it is intended to say that in every instance in which a private corporation in this state has bought bank stock as an investment the stockholders may be held individually liable for the stock, we think the proposition is too broad, and is not

necessary to be declared in this case in which there is no doubt of the fact that the Palmetto Brokerage Company was created as a holding company of the 900 shares of the stock of Peoples State Bank of South Carolina, and that this stock was assigned to it by Albert Sottile for the purpose of evading the statutory liability about to attach to it.

"But let us suppose that a private corporation already existing and doing a lawful business invest the funds of the corporation in the stock of a bank which is then apparently in sound financial condition, but which thereafter goes into liquidation. Would equity impose the statutory liability upon the stockholders of the corporation, who were ignorant of the fact that the corporation owned the bank stock?

"This question is not required to be decided in this case, and we think it had best be left to be decided, when the occasion comes, in the light of the facts of each case as it arises."

Thus it is established:

■ (1) That a court of equity will look through the corporate entity to the real owners of the bank stock shares, to wit, its stockholders and assess against them *the liability attaching to the ownership thereof.*

(2) The *liability attaches:* (a) Where stock was transferred to the corporation *for the purpose of avoiding the statutory liability;* (b) where the corporation form of organization is adopted *in an endeavor to evade the statute, or to modify its intent.*

Many cases are cited in the argument in which the established principles are discussed and applied to the facts of the particular case; notably Hamilton Ridge Sales Corporation et al. v. Wilson et al., 25 F.(2d) 592 (C.C.A.4th). With these cases there is, I think, no conflict in my application of the law relating to stockholders' liability in South Carolina State banks, as declared by the Supreme Court of South Carolina. See, also, Corker v. Soper (C.C.A.) 53 F.(2d) 190; Laurent v. Anderson (C.C.A.) 70 F. (2d) 819; Barbour v. Thomas (D.C.) 7 F. Supp. 271; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; Harris Investment Co. v. Hood, 123 Fla. 598, 167 So. 25; Fors v. Farrell, 271 Mich. 358, 260 N.W. 886, in connection with Simons v. Groesbeck, 268 Mich. 495, 256 N.W. 496; Forrest v. Jack, 294 U.S. 158, 55 S.Ct. 370, 79 L.Ed. 829, 96 A.L.R. 1457.

Having hereinbefore found that the circumstances attending the transfer of stocks in other banks to the investment corporation by certain of the subscribers to investment corporation stock negatived the idea of effort to evade liability thereby, the sole remaining question is whether the corporation was organized and conducted in such manner as to evidence a purpose to evade the statute or modify its intent. The statutory intent being, as also hereinbefore stated, to protect corporate stockholders from loss on their investment or use of corporate funds for possible hazardous and penalty-attached purposes, the issue is again narrowed squarely to an examination and finding from the evidence on intent and purpose of the organization and use of the corporation.

Here, in a time of general prosperity and almost universal bank expansion projects, evidencing the best thought of experienced bankers throughout the nation, what "the Rhett group" believed to be sound banks were consolidated into what · must have·promised to be a strong central banking corporation, affording better and safer banking facilities in and for the affected communities. The provisions of section .7677, par. 5, of the corporation laws were inferentially unknown to "the Rhett group." They had control of an existing general securities corporation, the Peoples Securities Company, then the holder of a large amount of Peoples State and other affiliated bank stocks. The intent and purpose of the formation of an additional corporation to relieve Peoples Securities Company and to assist in the expansion program then under way, with the charter provisions as set out, in the absence of proof to the contrary, will be presumed to have been planned in good faith. Bound in all respects by, and constructively charged with knowledge of, section 7677, it is proper to assume that their intention was to operate Peoples Investment Company for the purpose indicated in its charter and to market to individuals in an orderly manner bank stocks so subscribed for and contemplated to be subscribed for upon the attainment of the anticipated general results by the Peoples State Bank, so expanded. The unfortunate result so generally experienced at that time, and due to economic conditions producing unforeseen financial unrest and fear, followed by general collapse of the economic and financial structure of the entire banking and business of the nation, cannot be coupled with the initial stages of the transaction so as to be implied and applied to "the Rhett group" in connection with or as an explanation of their initial intent and purpose.

The argument that the failure of any and all of "the Rhett group" to testify makes applicable to them the well-recognized principle that a failure of defendants to disclose in proper cases facts peculiarly within their knowledge, justifies the assumption that such disclosures, if made, would be against their interest, is in no way applicable. It cannot be inferred or presumed that it was their deliberate purpose to evade liability and to avoid the statutory intent, and such positive proof is lacking in plaintiff's case. The court, from the evidence produced, has a history of the entire transaction and its disastrous ending, and must take judicial notice of the causes contributing to the disaster. The stock held by investment company was issued direct to it by the bank and was paid for by corporate funds subscribed or otherwise obtained. This cash subscribed to the bank stock went into the general funds of the bank for the general benefit of its depositors in view of eventualities. The idea suggested by some of the courts that depositors in banking institutions look to the capital structure and depend upon the superadded liability for protection in making their deposits is pure theory. That the liability was established by law, for their protection, does not require emphasis upon this theory as the basis for an unjust determination, and it is a fair conclusion that few, if any, of those responsible for the $26,-000,000 or more on deposit in Peoples State Bank and its affiliates at the time of its closing gave a thought to the matter of stockholders' liability.

To revert to Nettles v. Sottile, supra, the question made in the opinion as to whether the liability attaching to the stockholders of a private corporation by investment of the corporate funds contrary to statute in stock of a bank, then apparently sound and solvent, indicates a contrary view as to such stockholders as were ignorant of the fact that the corporation owned bank stock. Further, and particularly applicable here, the court holds that there must be evidence of intent to evade liability or to perpetrate a fraud.

I find no evidence of such intent from the facts in this case. The entire plan, as evidenced, was conceived and executed in good faith, in the light of then existing con-

ditions. The liability would not attach, as I conceive it, to stockholders generally on the ground of implied knowledge, and would not attach to "the Rhett group," though organizers and controlling operators of the corporation, in the absence of evidence of intent to evade the liability or to modify the purpose of the statute.

With reference to the nature of stockholders' liability in South Carolina, the Supreme Court in Fischer v. Chisholm, 159 S. C. 395, at page 398, 157 S.E. 139, 140, says: "We do not agree that the assessment is in the nature of a penalty, as suggested by the appellants; while imposed under the provision referred to, the liability is *contractual in its nature,* arising by reason of the purchase of the stock, *the subscription being a voluntary act of the purchaser,* who makes it in contemplation of all applicable law and *understanding that he may be called upon for such contribution."* (Italics added.)

Courts do not make contracts. There is a vast difference between a stockholder of a bank, who by contract has voluntarily assumed the liability of a stockholder and then seeks by subterfuge to escape the liability voluntarily assumed by him, and the stockholder of a holding corporation, who has never subscribed to bank stock and never voluntarily assumed the obligations of a stockholder in the bank or understood that he might be "called on for such contribution."

Especially is this true here. The things done, were not done in the dark. Fraud is not presumed. There is no evidence of evil intent or attempt to evade the statute. The depositors made and kept their deposits in bank, with the ownership of the stock by the investment corporation either known to them, or easily ascertainable from the books of the bank. There was no change of ownership. They were not deceived. Nor is there any equity which would cause this court to set aside the corporate structure of investment corporation and hold its stockholders liable on a contract which they never intended to assume.

It is therefore unnecessary to follow up the distinction, urged in argument, between common and preferred stockholders, should they be held liable as true owners of the stock. In my opinion, the theory of true ownership does not apply.

It follows, from the findings and opinion of the court, that the complaint should be dismissed, with costs, and it is so ordered.